[No. A133590. First Dist., Div. Two. Oct. 12, 2012.]

CRYSTAL MORGAN et al., Plaintiffs and Appellants, v.
WET SEAL, INC., et al., Defendants and Respondents.

**COUNSEL**

Law Offices of Sima Fard and Sima Fard for Plaintiffs and Appellants.

Sheppard Mullin Richter & Hampton, Ryan D. McCortney, Matthew M. Sonne and Jason M. Guyser for Defendants and Respondents.

**OPINION**

**HAERLE, J.—**

## I. INTRODUCTION

Crystal Morgan, Karla Sylvester and Janay Famous (plaintiffs or appellants) filed this lawsuit against their former employer Wet Seal, Inc., and Wet Seal Retail, Inc. (Wet Seal). Plaintiffs alleged that Wet Seal violated California law by requiring employees to (1) purchase Wet Seal clothing and merchandise as a condition of employment and (2) travel between Wet Seal business locations without reimbursing them for mileage.

This appeal is from an order denying plaintiffs' class certification on the grounds that common questions do not predominate over individual questions with respect to either of their claims and that utilizing the class action

procedure is not the superior method for resolving this lawsuit. Appellants raise a panoply of issues on appeal but none provides any basis for reversal. Accordingly, we affirm the order denying class certification.

## II. STATEMENT OF FACTS[1]

### A. *Complaint Allegations*

On September 29, 2008, plaintiffs filed a complaint alleging that Wet Seal's employment policies violate both the Labor Code and the Business and Professions Code. In January 2010, plaintiffs filed their third amended complaint (TAC), the operative pleading for purposes of this appeal. Plaintiffs seek damages, restitution, and injunctive and declaratory relief for two allegedly unlawful policies.

First, plaintiffs allege that Wet Seal forces employees to purchase apparel, shoes and accessories from Wet Seal as a condition of their employment without reimbursement (the dress code claim). Plaintiffs contend that because purchasing Wet Seal merchandise is a necessary expense incurred in the discharge of work, Wet Seal's failure to reimburse employees for these purchases constitutes a violation of Labor Code section 2802 (section 2802). Plaintiffs further contend that the dress code policy violates Labor Code section 450 (section 450) by forcing employees to patronize Wet Seal stores without compensation. Finally, plaintiffs contend that the dress code policy violates Industrial Welfare Commission wage order No. 7, section 9, which is contained in title 8, section 11070, subdivision 9(A) of the California Code of Regulations (Wage Order 7) because it requires employees to wear apparel and accessories of a distinctive design or color.

The second unlawful policy alleged in the TAC is that Wet Seal requires employees to use their personal vehicles to drive to other Wet Seal business locations to attend mandatory meetings and perform other work and that, "regularly, and as a matter of practice," they do not receive indemnification for these expenditures as required by section 2802 (the travel expense reimbursement claim).[2]

---

[1] Appellants' statement of facts is argumentative, incomplete and contains statements which stretch the bounds of reasonable advocacy. Unfortunately, this is not the only example of appellants' failure to comply with the letter and spirit of the California Rules of Court.

[2] The TAC also contains allegations that these alleged employment policies constitute unfair competition in violation of Business and Professions Code section 17200 et seq. In the order denying class certification, the trial court focused on the Labor Code and wage order laws, reasoning that plaintiffs' unfair competition claims were predicated on the same allegations. Appellants adopt a similar approach in their appellate briefs and, therefore, we do too.

B. *Motions Regarding Class Certification*

On April 25, 2011, plaintiffs filed a motion for class certification pursuant to which they requested that the trial court certify the following dress code class: "All current and former employees, who worked for Wet Seal, Inc. in any California store (including but not limited to stores selling its Wet Seal brand, Arden B. brand, Zutopia and Contempo Casual brands) at any time from four years preceding the filing of this lawsuit . . . to the time that class certification is granted."[3] Plaintiffs also moved for certification of a subclass (the travel subclass) consisting of those class members "who used their own vehicles to travel to other stores, in connection with discharge of their job duties."

Plaintiffs argued that class certification was appropriate because (1) they are suitable class representatives, (2) the approximately 12,000 individuals who comprise the proposed dress code class are readily ascertainable from Wet Seal employee records and, (3) common issues of fact and law predominate over individual issues with respect to both the dress code claim and the travel expense reimbursement claim. As to this third factor, plaintiffs' theory was that Wet Seal's unlawful practices are reflected in written company policies which apply to all members of the putative class.

On the same day plaintiffs filed their motion, Wet Seal filed an opposing motion to deny class certification and to strike the class allegations from the TAC. Wet Seal argued, among other things, that their written dress code and travel expense reimbursement policies are lawful on their face and therefore adjudicating plaintiffs' claims would necessitate a highly individualized factual inquiry of each putative class member in order to determine whether the facially valid policies were applied in an unlawful manner.

The parties proffered voluminous evidence regarding Wet Seal's policies and practices during the putative class period, i.e., from September 2004 onward. That evidence comprises a significant portion of the 31-volume "Appellants' Appendix." With inadequate assistance from these parties, we will summarize the pertinent categories of that evidence.

---

[3] As best we can determine, all of the evidence before us pertains exclusively to Wet Seal and Arden B. brands. Like the parties, we sometimes use the term Wet Seal to refer to both of these brand names.

C. *Documentary Evidence of Companywide Policies*

 1. *Dress Code*

At the commencement of the putative class period in 2004, Wet Seal's "Employee Handbook" included a section titled "Employee Dress & Personal Appearance" which contains the following relevant provisions:

"Employees of Wet Seal enjoy a business casual work environment. The Company wants employees to feel comfortable at work while maintaining sensible dress and grooming habits. You are expected to report to work well-groomed, clean, and dressed according to the requirements of your position. [¶] . . . [¶]

"Employees who have regular interaction with the public and clients should talk to their managers for further direction on proper work attire. If you report to work dressed or groomed inappropriately, you may be prevented from working until you return to work well groomed and wearing the proper attire. Time spent to return home and change into appropriate clothing will not be paid.

"**Store Employees:

"The Wet Seal, Inc. store employees represent our Company and are required to dress in accordance with the current Company Dress Code guidelines. All employees are required to dress in a manner that is both respectful of our Customers and consistent with the current fashion attire that is reflected in the stores.

"The current Field Dress Code Guidelines can be found in the Store Operations Policies & Procedures Manual. Inappropriate dress will not be tolerated. Any violations of this policy may result in a disciplinary action up to and including termination. . . ."

Wet Seal issued new versions of its Employee Handbook in 2005 and 2010. The "Employee Dress & Personal Appearance" sections of these handbooks contain much of the language that was used in the 2002 handbook. Notably, the 2005 and 2010 handbooks also state: (1) "The current Dress Code can be obtained through Human Resources," and (2) "Employees are not required to wear the Company's clothing."

The 2004 edition of Wet Seal's store operations "Polices & Procedures Manual" contains a provision titled "EMPLOYEE DRESS CODE/PERSONAL APPEARANCE GUIDELINES" which states, in part:

"Wet Seal Employees represent Wet Seal to our Customers. Our Employees must exemplify the fashionable image we want to portray to our Customer. The Employee discount is a benefit that is offered to Employees to purchase and wear current store fashion merchandise. Employees are encouraged to wear Wet Seal merchandise at all times. It is essential that the Employees reflect Wet Seal style during working hours.* [¶] . . . [¶]

"*If an Employee does not have Wet Seal merchandise the Employee should wear clothing consistent with Wet Seal's brand."

In 2005, Wet Seal revised the dress code policy in its Policies & Procedures Manual. Instead of the language we have quoted above, the 2005 dress code policy states:

"The Wet Seal and Arden B store Employees represent our Company and are required to dress in accordance with the current Company Dress Code Guidelines. All Employees are required to dress in a manner that is both respectful of our Customers and consistent with the current fashion style that is reflected in the stores. Employees are not required to wear the Company's clothing.

"Those employees interested in purchasing company merchandise are eligible for an employee discount. . . . Employees are invited to wear Wet Seal or Arden B clothing during work hours, but are not required to do so."

During the relevant time period, Wet Seal also published several versions of its "Holiday Handbook." The 2004 Holiday Handbook contains language about the dress code that is substantially similar to the language in the 2002 Employee Handbook.

A 2006 Holiday Handbook focused on "the bling-y brilliance of the ' "GIFTED" ' girl" and referred to the Wet Seal customer as "OUR GIRL." Under a heading called "LOOK 'GIFTED,' " this handbook states: "Wet Seal team members represent Wet Seal to 'OUR GIRL.' Our team members must exemplify the fashionable image we want to portray to 'OUR GIRL.' The employee discount is a benefit offered to employees to encourage them to purchase and wear current store fashion. Team members are required to dress in a manner that is both respectful of 'OUR GIRL' and consistent with the current fashion trends that are reflected in our stores." A fall 2007 Holiday Handbook, which focused on "Stealing the Spotlight," contains substantially the same dress code guidelines that were set forth in the 2006 Holiday Handbook.

In 2007, Arden B. published a Holiday Handbook which states that "Fashion Specialists should be stylish, professional and wear clothes that

reflect current store fashion and colors." This handbook also states: "As a Fashionista on the sales floor, you must represent the Arden B. brand, current fashion trends and current color stories presented on the sales floor. [¶] Team members are required to dress in a manner that is both respectful to our customer, professional and consistent with the current fashion trends that are reflected in our stores." The guidelines in a 2008 Arden B. Holiday Handbook are substantially similar to the 2007 guidelines.

### 2. *Travel Expense Reimbursement*

All relevant versions of the Employee Handbook contain a provision titled "BUSINESS EXPENSE REIMBURSEMENT" which states, in part: "Employees may be reimbursed for reasonable expenses incurred in the course of business. These expenses usually include air travel, hotels/motels, meals, cab fare, rental vehicles and car mileage for personal vehicles."

The 2005 and 2008 editions of the Policies & Procedures Manual both state: "It is the policy of The Wet Seal, Inc. to reimburse Employees for necessary and reasonable travel expenses incurred in the course of Company business. Travel on Company business is defined as time spent by the employees to get to and from locations in the course of conducting Company business . . . ."

Wet Seal's "District Directors' Manual" contains a store travel policy. The 2006 and 2007 editions of this manual contain the following provision: "Given proper approvals, associates may use their personal cars for business travel when other transportation is unavailable or uneconomical. The use of personal cars for business is reimbursed only when total business mileage exceeds 5 miles in a workday. Reimbursement, if applicable, is at the standard IRS rate per mile plus tolls or parking. Additionally, if an associate travels to another place of business (e.g. to work at another store for a particular day, meeting site, etc.) they will be reimbursed for mileage, which exceeds their normal commute to and from their regular place of work . . . ."

The 2008 and 2009 editions of the District Directors' Manual both include the following provision as part of the store travel policy: "Employees may use their personal cars for business travel when transportation is unavailable or uneconomical. Reimbursement, if applicable, is at the standard IRS rate per mile, plus tolls or parking. Additionally, if an employee travels to another place of business (e.g. to work at another store for a particular day, meeting site, etc.) he/she will be reimbursed for mileage, which exceeds his/her normal commute to and from his/her regular place of work."

Wet Seal has a standard "Employee Expense Report" form which employees are required to complete in order to document reimbursable expenses they

have incurred. The first item of reimbursable expense that is listed on this form is a claim for reimbursement for automobile mileage.[4]

## D. Evidence of Company Practices

### 1. Declarations of Named Plaintiffs

The three named plaintiffs, Janay Famous, Crystal Morgan and Karla Sylvester, filed declarations in support of the class certification motion. Famous worked as a sales associate at a Wet Seal store in Sacramento for three months in 2005. Morgan was employed as an assistant manager at a Wet Seal store in Costa Mesa for four months in 2006. Sylvester worked as a sales associate in an Arden B. store in Los Angeles from September 2005 to April 2006.

Famous and Morgan stated that, when they were hired, they were told by their managers that the "Company" required employees to dress in Wet Seal merchandise "at all times." In her declaration, Sylvester stated that when she was hired her manager told her that the Company required all store employees to dress in Arden B. clothing and that the dress code was "all Wet Seal clothing and accessories." All three plaintiffs stated that they did not receive any reimbursement for the Wet Seal merchandise they purchased during the period of their employment.

Morgan and Sylvester both stated that they traveled between Wet Seal stores during the course of their employment, that they were not reimbursed for mileage for their work-related travel, and that they were "not aware that Wet Seal had a policy that addressed reimbursement for mileage for traveling between stores . . . ." Famous stated that, although she was never asked to travel to another store to "help out," she was not aware that Wet Seal had a "policy that addressed mileage reimbursement."

### 2. Putative Class Members Aligned with Plaintiffs

Plaintiffs submitted declarations by 51 former employees of Wet Seal, some who worked at a Wet Seal store and others who worked at an Arden B. store. Despite plaintiffs' strong reliance on this evidence, appellants have provided this court with no meaningful summary of the substantive content of these declarations.[5]

---

[4] Wet Seal produced the expense records of over 100 putative class members which show that these employees were reimbursed for store travel.

[5] According to appellants' opening brief, these 51 individuals all "stated what the company policy was which included wearing Wet Seal current fashion at all times and during 'Wear it

Some of these declarants stated that, when they were hired, a manager told them that they were expected or required to wear Wet Seal/Arden B. attire at work. However, the majority of these individuals stated that they were told that they were expected or required to dress in Wet Seal clothing or in "current fashion as displayed in the store," or words to that effect.

More than half of these declarants stated that they were never asked to "help out" at another store location but also claimed they were not aware that Wet Seal had a policy that addressed reimbursement for mileage for traveling between stores. The remaining declarants had many different things to say about Wet Seal's travel reimbursement policy for mileage for business-related travel.

Some former employees stated that they were asked to help out at other stores, but they were not aware of a mileage reimbursement policy and they were not reimbursed for their mileage. Others stated that they did engage in work-related travel but did not disclose whether they were reimbursed for mileage or not. Other members of this group stated that they were not aware of a Wet Seal mileage reimbursement policy but that they were reimbursed for their mileage. One former employee stated that she was asked to "help out" at another store but that she did not recall if she received mileage reimbursement and she did not remember if Wet Seal had a mileage reimbursement policy.

### 3. *Putative Class Members Aligned with Wet Seal*

Wet Seal submitted declarations from 114 putative class members, all of whom stated that they have never been required to wear Wet Seal clothing and that they do not interpret the Wet Seal dress code policy to require that Wet Seal employees wear Wet Seal clothing at work. Some of these individuals were managers while others were sales associates.

According to respondents' brief on appeal, 107 of these individuals also expressly attested that "they do not have any business-related expenses for which Wet Seal failed to reimburse them." Although Wet Seal fails to support this factual claim with appropriate references to the record, appellants do not dispute it in their reply brief.

### 4. *Wet Seal E-mails*

Plaintiffs supported their motion with copies of several e-mails authored by Janee Simon, who was Wet Seal's district director for Los Angeles during at least part of the relevant time period.

---

Weekends.' " As support for this obtuse statement, appellants cite to more than 200 pages of the Appellants' Appendix. We strongly discourage this patently unreasonable approach to appellate brief writing.

In one e-mail, which was sent to eight store managers, Simon outlined the "areas we have to improve on immediately!" One of Simon's concerns was that the "team" was not wearing the "new trends" that she thought customers should see. Simon stated, "I know our success would improve if our team were wearing current mdse each weekend—I need to make sure mgmt are hiring sales who want to buy fashion. [¶] Hire some new staff! You are letting people work who are not dressing for Wet Seal and this is distressing to me."[6]

In another e-mail sent to five store managers, Simon stated that "[o]ur fashion specialists must represent our brand and our image daily. This is not happening in our stores at this time." Simon discussed an example of "two very good fashion specialists" who had arrived at work for Arden B. that day who "do not represent our brand at all." Simon stated that employees should not wear flat sandals and that they should "Dress business casual, sophisti-cated and woman of the times; do not allow your employee's [sic] to dress down as these two did."

On March 3, 2010, Simon sent an e-mail to a Wet Seal employee named Tricia Sprowell, in which she stated that she had sent out a global message to store managers that "the policy states for the company that we do not HAVE to wear our merchandise but we need to wear merchandise that is related to our current trends . . . ." Simon told Sprowell that the purpose of her message was to "inspire" the managers to "inspire" their teams to become informed and up to date about the new trends. Simon also told Sprowell that, in her message, she said "nothing about [sic] has to be our merchandise at all—just current fashion trends."

### E. *The Order Denying Class Certification*

On August 5, 2011, a hearing on the motions for and against class certification was conducted before the Honorable John E. Munter. On August 16, the court filed a 15-page order denying class certification. The court's detailed order contains a thorough and well-reasoned analysis of the pertinent facts and issues. The discussion section of the order is divided into two main parts.

Preliminarily, the court addressed evidentiary matters. Observing that plaintiffs had lodged a "litany of frivolous evidentiary objections spanning

---

[6] In their opening brief to this court, appellants quote select phrases from this document and state that it was generated "on or about February 20102 [sic]." However, they fail to provide an accurate record reference for this document. The copy of this e-mail (which we have located without appellants' assistance) does not reflect a date. The language we have quoted above is all in capital letters, as are many of Simon's comments relating to other issues not relevant to this litigation.

over 270 pages," the court characterized this case as a "paradigm case of abuse that runs afoul of the Supreme Court's proscription against meritless and inconsequential evidentiary objections that serve to divert a court's attention from the key issues in a case." The court then denied all of plaintiffs' objections to Wet Seal's evidence, although it also noted that it had not relied on some of the declarations that plaintiffs found objectionable. The court then found that many of Wet Seal's objections to plaintiffs' evidence had merit, but nevertheless decided to treat all of plaintiffs' evidence as if it was admissible, and to give that evidence the weight it deserved. Finally, the court granted all requests for judicial notice as to which no objection was made, and granted in part an April 25, 2011, request for judicial notice filed by Wet Seal which plaintiffs had opposed.

In a separate section of its order, the court outlined two reasons for denying plaintiffs class certification. First, the court concluded that individual issues would predominate over any common issues pertaining to both the dress code claim and the travel expense reimbursement claim. In this regard, the court found that Wet Seal's written dress code and travel expense reimbursement policies do not provide a common method of classwide proof on central questions of liability.

The second reason for the decision to deny class certification was that "utilizing the class action procedure is not a superior method for dealing with the instant allegations." In this regard, the court found, among other things, that the numerous individual issues would "pose overwhelming case management difficulties," and that plaintiffs did not present a "manageable trial plan" for adjudicating the merits of their claims.

## III. DISCUSSION

We review the order denying class certification under the abuse of discretion standard of review. (*Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319, 327 [17 Cal.Rptr.3d 906, 96 P.3d 194] (*Sav-On*); *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1022 [139 Cal.Rptr.3d 315, 273 P.3d 513] (*Brinker*).) "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." (*Linder v. Thrifty Oil Co.* (2000) 23 Cal.4th 429, 435 [97 Cal.Rptr.2d 179, 2 P.3d 27] (*Linder*).) "[A] trial court ruling supported by substantial evidence generally will not be disturbed 'unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]' [citation]. . . . 'Any valid pertinent reason stated will be sufficient to uphold the order.' [Citation.]" (*Id.* at pp. 435–436.)

## A. Guiding Principles

 "Generally, a class suit is appropriate 'when numerous parties suffer injury of insufficient size to warrant individual action and when denial of class relief would result in unjust advantage to the wrongdoer.' [Citations.] But because group action also has the potential to create injustice, trial courts are required to ' "carefully weigh respective benefits and burdens and to allow maintenance of the class action only where substantial benefits accrue both to litigants and the courts." ' [Citations.]" (*Linder, supra*, 23 Cal.4th at p. 435; see Code Civ. Proc., § 382.)

"[T]he class action proponent bears the burden of establishing the propriety of class certification." (*Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 922 [103 Cal.Rptr.2d 320, 15 P.3d 1071]; see *Sav-On, supra*, 34 Cal.4th at p. 326; *Linder, supra*, 23 Cal.4th at pp. 434–435.) "Class certification requires proof (1) of a sufficiently numerous, ascertainable class, (2) of a well-defined community of interest, and (3) that certification will provide substantial benefits to litigants and the courts, i.e., that proceeding as a class is superior to other methods. [Citations.] In turn, the 'community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class.' [Citation.]" (*Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 [56 Cal.Rptr.3d 861, 155 P.3d 268].)

## B. The Element of Predominance of Common Issues

Most of appellants' arguments on appeal pertain to the trial court's finding that individual issues predominate over common issues with respect to both the dress code claim and the travel expense reimbursement claim.[7] "Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.]" (*Brinker, supra*, 53 Cal.4th at p. 1022.)

### 1. Plaintiffs' Burden

 To obtain class certification, plaintiffs had the burden of establishing that common questions of fact or law predominate over individual issues in this case. (*Sav-On, supra*, 34 Cal.4th at p. 326; see *Linder, supra*, 23 Cal.4th at pp. 434–435.) To carry that burden, they were required to do more than

---

[7] Appellants' opening brief is very poorly organized and many of their arguments are redundant or not sufficiently clear to merit a response. Therefore we note at the outset of our analysis that we have given due consideration to all of appellants' arguments whether or not we expressly discuss them herein.

simply show that common issues exist. Rather, plaintiffs needed to "place substantial evidence in the record that common issues predominate." (*Lockheed Martin Corp. v. Superior Court* (2003) 29 Cal.4th 1096, 1108 [131 Cal.Rptr.2d 1, 63 P.3d 913], italics omitted.) " '[E]ach member [of the class] must not be required to individually litigate numerous and substantial questions to determine his [or her] right to recover following the class judgment; and the issues which may be jointly tried, when compared with those requiring separate adjudication, must be sufficiently numerous and substantial to make the class action advantageous to the judicial process and to the litigants.' " (*Ibid.*)

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible." (*Brinker, supra*, 53 Cal.4th at pp. 1021–1022.)

### 2. The Trial Court's Findings

In the present case, appellants repeatedly ignore or mischaracterize the findings and analysis set forth in the order denying class certification. Therefore, we think it is important to clarify what the trial court found before we turn to appellants' claims of error.

### a. The Dress Code Claim

According to the TAC, Wet Seal enforces a companywide dress code policy which violates section 2802, section 450 and Wage Order 7.

Section 2802, subdivision (a) requires employers to indemnify employees "for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer."

Section 450 provides, among other things, that an employer may not "compel or coerce any employee, or applicant for employment, to patronize his or her employer, or any other person, in the purchase of any thing of value." (*Id.*, subd. (a).)

Wage Order 7 states that "[w]hen uniforms are required by the employer to be worn by the employee as a condition of employment, such uniforms shall be provided and maintained by the employer." Under this order "uniform" includes "apparel and accessories of distinctive design or color."

The trial court found that plaintiffs' dress code claim raises several liability issues which would need to be resolved on an individual basis, including for example (1) whether Wet Seal requires employees to wear Wet Seal merchandise as a condition of employment; (2) whether Wet Seal coerced or compelled employees to purchase its merchandise; (3) assuming employees purchased wardrobe items for work, whether those purchases were necessary expenditures; and (4) assuming employees were required to wear certain wardrobe items to work, whether those items constituted a uniform.

The court found that these legal issues are not common issues in this case because there is no classwide method of proving Wet Seal's liability. In reaching this conclusion, the court identified numerous flaws in plaintiffs' theory that Wet Seal's written dress code policy provides a common classwide method of proving liability.

First, the written policies do not state that employees were "required" to purchase Wet Seal clothing as a condition of employment. Thus, answering the "central" liability question whether Wet Seal employees were required to wear Wet Seal clothing as a condition of employment or otherwise compelled to purchase Wet Seal merchandize would require several individualized inquiries including "(1) what, if anything, the employee was told by his or her store manager regarding purchasing Wet Seal clothing or wearing Wet Seal clothing to work; (2) if such a discussion occurred, when and with whom the employee had that discussion; (3) how the employee interpreted that discussion; (4) whether the employee's interpretation was reasonable; and (5) whether the employee then purchased Wet Seal clothing to wear to work pursuant to that discussion."

Second, the written policies do not "explain with any specificity" what employees are required to wear, but instead use broad and vague standards like requiring employees to dress in a manner "consistent with the current fashion style that is reflected in the stores. . . ." Thus, for example, determining whether the attire allegedly required by Wet Seal constitutes a uniform within the meaning of Wage Order 7 would require several individualized inquiries, including "(1) what was the current fashion style reflected in each store at a given period of time; (2) whether that style was of a distinctive color or design; (3) how each store manager interpreted the phrase 'Wet Seal style' or 'consistent with the current fashion style that is reflected in the stores'; (3) whether each manager required the employees to wear

clothing of a distinctive design or color; and (4) whether each manager required the employees to wear clothing that is usual or generally usable in the occupation."

Third, because the written policy does not describe what an employee is supposedly required to wear, the court found that individualized inquiries would be necessary in order to determine whether any given purchase by an employee constituted a "necessary expenditure[]" within the meaning of section 2802. For example, individualized inquiries would be necessary to address "(1) what, if anything, the manager told the employee regarding the required wardrobe; (2) assuming the employee purchased certain wardrobe items to wear to work, where the employee purchased those items; and (3) the particular wardrobe items actually purchased."

The trial court also found that the evidence submitted by both sides demonstrates that plaintiffs' theory of liability regarding its dress code claim is not "reasonably susceptible to common proof but rather would require individualized inquiries into a myriad of circumstances depending on the particular direction of individual store managers and supervisors at numerous stores in widely varying locations and over the course of many years." In reaching this conclusion, the court expressly found that plaintiffs' evidence, particularly the 55 employee declarations, demonstrate that "the common written dress code policy did not lead to common dress code practices."

b. *The Travel Expense Reimbursement Claim*

According to the TAC, Wet Seal employees were "required" to use their personal vehicles to drive between store locations during working hours, but Wet Seal "did not pay the required compensation for the costs associated with driving to and from [Wet Seal] business locations." Thus, plaintiffs alleged that "as a matter of practice," Wet Seal violated section 2802 by failing to indemnify employees for expenditures and losses incurred during the performance of their work.

The trial court found that proving the travel expense reimbursement claim would require numerous individual inquiries. The written travel reimbursement policy states that Wet Seal will reimburse employees "for reasonable expenses incurred in the course of business." However, plaintiffs' theory of liability is that "as a matter of practice" Wet Seal employees were not reimbursed for travel/mileage expense as required by section 2802. In briefs filed in support of the motion for class certification, plaintiffs characterized the allegedly illegal policy as "hit or miss." Thus, the court concluded, plaintiffs had essentially conceded that "Wet Seal's travel reimbursement practice was not consistent across the board."

The court also found that plaintiffs' own evidence demonstrated that "Wet Seal's practices varied." For example, the court pointed out, some of the employees who submitted declarations on behalf of plaintiffs stated that they had been reimbursed for mileage, while others had not. Moreover, Wet Seal produced evidence that over 100 putative class members were reimbursed for mileage, gas, bus fare, travel meals and various other expenses incurred in connection with their jobs.

Ultimately, the court concluded that proving liability based on the alleged "hit or miss" reimbursement policy would require individualized inquiries to address numerous issues including: "(1) what, if anything, the manager told the employee regarding reimbursement of travel expense; (2) whether each travel expense was necessary and a direct consequence of the discharge of the employees['] job duties; (3) whether the employee sought reimbursement of that expense in compliance with the procedures set forth in Wet Seal's reimbursement policy; [and] (4) whether the employee was in fact reimbursed for that expense."

### 3. Objection to Merit-based Analysis

Attempting to avoid our deferential standard of review, appellants posit that the trial court erred as a matter of law by employing an "improper criteria" in the context of a class certification motion. Specifically, appellants complain that the trial court based its decision on a substantive evaluation of the merits of plaintiffs' legal claims.

As a general rule, class certification should not be "conditioned upon a showing that class claims for relief are likely to prevail." (*Linder, supra*, 23 Cal.4th at p. 443.) "The certification question is 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' [Citation.]" (*Sav-On, supra*, 34 Cal.4th at p. 326.) However, "issues affecting the merits of a case may be enmeshed with class action requirements, such as whether substantially similar questions are common to the class and predominate over individual questions or whether the claims or defenses of the representative plaintiffs are typical of class claims or defenses. [Citations.]" (*Linder, supra*, 23 Cal.4th at p. 443.)

In *Linder*, our Supreme Court acknowledged that screening class causes of action for legal sufficiency before ruling on certification may sometimes better serve important interests of fairness and efficiency, but it determined that there are other mechanisms for weeding out legally meritless suits prior to certification, such as a demurrer or some other pretrial motion. (*Linder, supra*, 23 Cal.4th at pp. 440–441.) However, the court also affirmed the principle that "trial courts should be afforded flexibility in dealing with class

actions," and, in keeping with that principle, held that "in the exceptional case where the defense has no other reasonable pretrial means to challenge the merits of a claim to be asserted by a proposed class, the trial court may, after giving the parties notice and an opportunity to brief the merits question, refuse class certification because the claim lacks merit as a matter of law." (*Id.* at p. 443.)

In the present case, appellants contend that the trial court violated *Linder, supra*, 23 Cal.4th at page 443, because it based its decision on an evaluation of the merits of plaintiffs' claims without first giving plaintiffs notice or the opportunity to brief the merits question. To the contrary, the trial court discussed *Linder* in its denial order and properly applied the *Linder* principles in its discussion. *Linder* states that a trial court is not precluded from "scrutinizing a proposed class cause of action to determine whether, assuming its merit, it is suitable for resolution on a classwide basis." (*Ibid.*) Here, the trial court considered the merits of plaintiffs' causes of action only for the limited purpose of assessing whether substantially similar questions were common to the class and predominated over individual questions, something that *Linder* expressly allows. (*Ibid.*)

Appellants contend that the trial court "erred in conducting a merit analysis and interpreting the Wage Order against Plaintiffs and in doing so erroneously framed the class certification questions based on such interpretation." Appellants fail to explain how the trial court interpreted Wage Order 7 "against" them.

As noted above, in order to determine whether common or individual issues predominate, the trial court discussed the laws that plaintiffs alleged Wet Seal violated. Thus, for example, the court observed that plaintiffs had alleged that Wet Seal's dress code policy violates Wage Order 7, and it also quoted the relevant provisions of that wage order. The court also considered the definition of the term "uniform" that has been approved by the Department of Labor Standards Enforcement (DLSE), noting that the DLSE is "the state agency empowered to enforce California's labor laws, including IWC wage orders." Utilizing that definition and the language of Wage Order 7 itself, the court made this observation: "Thus, in order to determine whether certain wardrobe items constitute a 'uniform' within the meaning of subdivision 9(A), courts must consider whether the dress code policy requires wardrobe items that are usual and generally usable in the occupation and whether those items have a distinctive design or color."

The factual and legal issues relating to this prong of the dress code claim were directly relevant to the certification inquiry that the court was asked to conduct. The TAC contains an express allegation that Wet Seal violated Wage

Order 7. Furthermore, the trial court took judicial notice of the content of Wage Order 7 pursuant to plaintiffs' request for judicial notice. The trial court did not make a substantive ruling regarding the merits of this part of plaintiffs' case simply because it looked at the language of the wage order itself.

In their reply brief, appellants complain about the fact that the trial court considered the DLSE definition of a "uniform." According to appellants, the court used that "narrow" definition to "narrowly construe[] the Wage Order as against the employees . . . ." This vague notion does not constitute a cognizable claim of error. Appellants do not actually address the substance of either Wage Order 7 or the DLSE definition or even identify any substantive distinction between them. Indeed, appellants do not directly dispute the validity of the DLSE definition of a uniform. More fundamentally, appellants simply ignore the reason the trial court consulted these legal authorities, i.e., in order to determine whether there was a common legal issue, not to make a substantive ruling regarding the merits of plaintiffs' legal claim.

### 4. Objections Regarding Use of Case Authority

Appellants contend the trial court used improper criteria by relying on certain cases and allegedly ignoring others.

First, appellants contend that the trial court erred by relying on a depublished decision, *Faulkinbury v. Boyd & Associates** (Cal.App.). However, the trial court did not discuss the substance of *Faulkinbury*, but only cited it once to support the following proposition: "while a court ordinary [*sic*] does not reach the merits of an action when deciding a certification motion, courts do examine the elements of the alleged claims in the context of deciding whether common issues exist and predominate." Appellants do not dispute this legal proposition; nor could they in light of the fact that it was expressly approved in *Linder, supra*, 23 Cal.4th at page 443, as the trial court recognized in its written order in this case.

Second, appellants forcefully contend that the trial court committed reversible error by relying "almost exclusively" on *Howard v. Gap, Inc.* (N.D.Cal., Oct. 29, 2009, No. C06-06773 WHA) 2009 U.S.Dist. Lexis 105196 (*Gap*). The order denying class certification contains a one-paragraph discussion of the facts of the *Gap* case prefaced by the trial court's observation that the case is "instructive." In appellants' view, the trial court also tracked the reasoning of the *Gap* court and essentially used that case as the basis for its

decision to deny class certification. Doing our best to find a concrete claim of error, it appears that appellants are complaining that the *Gap* case is substantively irrelevant.[8] We disagree. The *Gap* case addressed the requirement of a predominance of common issues in the context of a substantially similar factual claim.

The *Gap* plaintiff was a former employee who challenged Gap's alleged policy of requiring employees to purchase and wear Gap clothing. (*Gap, supra,* 2009 U.S.Dist. Lexis 105196 at p. *1.) Gap disputed that it imposed such a policy and produced evidence that its written policies, both during the time of plaintiff's employment and thereafter, encouraged employees to purchase and wear Gap clothing but did not require them to do so. (*Id.* at pp. *3–*4.) The district court denied a motion for class certification finding, among other things, that issues common to the putative class did not predominate over individual issues. (*Id.* at pp. *6–*16.)

The *Gap* court recognized that the question whether Gap had a policy requiring employees to purchase and wear Gap clothing was a common issue among the putative class, but it found that there was no classwide common method of proof with respect to this issue because Gap's written policies did not state that employees were required to purchase and wear Gap clothing but only encouraged them to do so. The plaintiff acknowledged that her own claim was predicated on "*oral* instructions," but she claimed that she "received these instructions as part of a 'routinized orientation that itself conformed to the written material distributed to her'" at her employee orientation. (*Gap, supra,* 2009 U.S.Dist. Lexis 105196 at p. *11.) However, the declarations of putative class members established that there were individual variations as to what employees were told about the dress policy and that not all employees were told that they were required to wear Gap clothing. (*Id.* at pp. *11–*12.)

The *Gap* court denied class certification because the "absence of a common class-wide method of proof" went to the "core question" of liability: "whether employees were compelled to use their wages to purchase and wear Gap clothing as a condition of their employment." (*Gap, supra,* 2009 U.S.Dist. Lexis 105196 at p. *12.) The court concluded that the individual issues that would have to be addressed to answer this question "would overwhelm any common issues." (*Ibid.*)

---

[8] Appellants also intimate that the trial court erred by relying on non-California authority. However, as the trial court observed in its order, "[f]or guidance in class certification matters, California courts may look to the Federal Rules of Civil Procedure, rule 23 [citation], and case law interpreting" rule 23. (*Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 147, fn. 2 [127 Cal.Rptr.3d 394].)

The *Gap* decision is analogous to the present case and the trial court did not abuse its discretion by so stating. Here, as in *Gap*, there is no classwide method of proof with regard to the fundamental liability questions at the heart of both sets of plaintiffs' claims. Wet Seal's written polices do not require employees to (1) purchase and wear Wet Seal clothing as a condition of employment and/or (2) use their own vehicles to travel on work business without reimbursement. All of the named plaintiffs submitted declarations which establish that their own claims are based on oral instructions from their specific manager(s). Furthermore the declarations of putative class members submitted by both plaintiffs and Wet Seal show that employees were told different things about the challenged policies and that many of them were not told that they were required to purchase and/or wear Wet Seal merchandise or to pay for their mileage for work-related travel.

Appellants contend that the trial court should not have relied on *Gap* because the *Gap* court recognized that case would have been suitable for class certification if the plaintiff had "put forward a common policy," and, in this case, "there exists a companywide policy that forms the basis of the alleged injuries for expense reimbursement." This logic is flawed. Like appellants, the *Gap* plaintiff did allege that there was a companywide policy. But that allegation was not sufficient in and of itself to establish that common issues predominated because Gap disputed that it had such a policy and there was no classwide method of proof for resolving this key liability question. Appellants face the same problem that defeated the class certification motion in *Gap*. They have alleged that there are two illegal policies that apply to the class but they failed to produce substantial evidence of a companywide policy which can be used as a method of establishing liability. The written policies are not substantial evidence that Wet Seal engaged in the allegedly illegal policies; arguably, they support the contrary conclusion. Furthermore, the anecdotal evidence regarding Wet Seal's application of its dress code and travel expense reimbursement policy is not substantial evidence of a class-wide practice that could be used as a common method of proving liability. To the contrary, that evidence, much of which was submitted by plaintiffs themselves, reinforces the conclusion that Wet Seal's liability to putative class members will have to be decided on an individualized basis.

Appellants' third complaint regarding the trial court's use of case law is that the court erred by ignoring plaintiffs' case authority. For example, appellants complain that the trial court erred by ignoring *Estrada v. FedEx Ground Package System, Inc.* (2007) 154 Cal.App.4th 1 [64 Cal.Rptr.3d 327] (*Estrada*), a "California leading authority on point cited by Plaintiffs."

*Estrada* was an appeal from a class action judgment holding FedEx liable for its policy of erroneously treating its drivers as independent contractors

rather than employees. (*Estrada, supra*, 154 Cal.App.4th 1.) One issue on appeal was whether the trial court abused its discretion by certifying a class. (*Id.* at p. 13.) Finding no such abuse, the *Estrada* court affirmed the trial court's finding that there was a predominance of common issues, including whether drivers were employees and, if so, which of their expenses were reimbursable. (*Id.* at pp. 13–14.) In reaching this conclusion, the court also affirmed the trial court's evidentiary ruling that anecdotal evidence regarding the application of the defendant's written policy was admissible at trial because it was relevant to the class as a whole to show the defendant's "power to interpret the Operating Agreement." (*Id.* at p. 14.)

We reject appellant's contention, unsupported by *any* meaningful discussion, that *Estrada* is "on point." Obviously, *Estrada* was procedurally very different from the present case. Beyond that, there did not appear to be any dispute regarding the nature of the defendant's employment policy. The legality of that companywide policy was the core issue in terms of liability and that common issue predominated in that case. Here, by contrast, Wet Seal disputes the TAC allegations regarding the nature of its companywide policy and the trial court found that the proponents of class certification failed to produce substantial evidence of a classwide method of proving that Wet Seal has engaged in the allegedly unlawful practices.

Appellants also contend that the trial court erred by ignoring *Kurihara v. Best Buy Co.* (N.D.Cal., Aug. 29, 2007, No. C 06-01884 MHP) 2007 U.S.Dist. Lexis 64224 (*Kurihara*). In that case, the plaintiff alleged that the defendant's companywide employee inspection policy was illegal. (*Id.* at pp. *3–*6.) Best Buy opposed a motion for class certification on the ground that variations regarding the application of its formal written inspection policy raised too many individual issues. (*Id.* at p. *7.) In granting class certification, the district court found, among other things, that there was a predominance of common issues. As the court explained, "[h]ere, plaintiff has provided substantial evidence of the existence of a company-wide policy whereby employees are subject to inspections, and not compensated for the time spent on those inspections. This policy forms the bases of the alleged injuries at the center of this action." (*Id.* at p. *29.) The court also found that Best Buy's evidence did not defeat the motion for class certification, noting that although there would likely be individual issues regarding implementation of the defendant's policy, the "overarching question of whether this policy results in unlawful undercompensation . . . is common and predominant." (*Id.* at p. *30.)

Appellants contend that this case is like *Kurihara* because "there exists a companywide policy that forms the basis of the alleged injuries for expenses reimbursement." Appellants further contend that *Kurihara* illustrates that the

individual issues raised by Wet Seal's anecdotal evidence are not sufficient to trump the common liability issue in this case.

First, this case is not like *Kurihara* simply because Wet Seal has written companywide dress code and travel reimbursement policies. As the trial court found, those written policies do not provide a common method of proving liability because they are not substantial evidence of the allegations in the TAC which describe the allegedly illegal employment practices. In other words, although Wet Seal does have written company policies, those policies are not substantial evidence of the conduct alleged in the TAC which forms the basis of plaintiffs' legal claims. Second, anecdotal evidence plays a fundamentally different role in this case than it did in *Kurihara*. In this case, *plaintiffs* offered anecdotal evidence to support their theory of liability, i.e., that Wet Seal engaged in an unlawful companywide practice of requiring employees to purchase and wear Wet Seal merchandise as a condition of employment. In light of this circumstance, Wet Seal's anecdotal evidence was as relevant as plaintiffs' own declarations. More to the point, all of that evidence was consistent with the trial court's conclusion that there is no common classwide method of proving plaintiffs' theory of liability.

### 5. Plaintiffs' Theory of Liability

Appellants contend that the trial court erred by ignoring their theory of liability and basing its decision on the erroneous assumption that "in order to answer the central questions on liability, one has to look beyond the written policy to the practices employed by each manager at each of the 74 retail stores during a period of time spanning almost seven years."

■ The trial court's observation that the trier of fact will have to look beyond the written policies to the practices of each manager was neither "erroneous," nor was it an "assumption." Rather, the court considered the evidence of Wet Seal's written policies during the relevant time period and then made a finding of fact that those policies do not constitute substantial evidence that Wet Seal engaged in either of the unlawful practices alleged in the TAC. Indeed, for most of the relevant time period, the applicable written policies expressly state that employees are not required to wear Wet Seal clothing and also that employees may seek reimbursement for work-related travel. Despite these facts, the trial court refrained from making any substantive finding regarding the merits of plaintiffs' claims, but rather made the accurate observation that, in order to prove those claims, plaintiffs would have to produce evidence beyond the written policies themselves.

Appellants make several arguments which are intended to avoid the plain fact that Wet Seal's written policies are not substantial evidence of the

companywide conduct alleged in the TAC as the factual predicate for plaintiffs' legal claims. For example, they argue that Wet Seal repeatedly acknowledged that its dress code and travel reimbursement policies apply company wide to all putative class members. But liability does not rest on proof of a companywide policy. It rests on allegations that Wet Seal's companywide policies are illegal because they (1) *require* employees to wear Wet Seal merchandise as a condition of employment and (2) *deny* employees mileage reimbursement for business-related travel. Wet Seal has consistently and vehemently denied these substantive allegations of illegal conduct.

Appellants also argue that the fact that some of the written policies expressly state that employees are not required to wear Wet Seal merchandise is not relevant because "even though the words 'not required' are used, the employees were forced or compelled to purchase the Wet Seal merchandise." By making this argument appellants lose sight of the issue at hand. The trial court found that the written policies do not afford a classwide method of proving liability. It did not hold or intimate that this evidence precludes plaintiffs from proving their individual claims against Wet Seal.

### 6. *Plaintiffs' Alternative Methods of Proof*

Appellants contend that the trial court made the erroneous assumption that "the dress code policy was only disseminated by store managers verbally and enforced by them." Most of the evidence plaintiffs submitted in support of their certification motion was designed to show that Wet Seal store managers verbally communicated and enforced an illegal dress code policy. By considering that evidence and identifying the problems with using it to extrapolate liability across the proposed class, the trial court did not make any improper "assumption" or otherwise err.

In any event, to the extent appellants are suggesting that they produced other types of evidence that provide a classwide method of proving plaintiffs' theory of liability, we disagree.

First, appellants contend that evidence of e-mails authored by district director Janee Simon, show "unequivocally" that corporate employees "were required to wear current Wet Seal and Arden B. attire." The Simon e-mails are not "unequivocal" evidence of a companywide illegal dress code policy. To the contrary, appellants pluck isolated statements from their context and construe those statements in an extremely self-serving manner. More to the point, the e-mail evidence does not undermine the trial court's conclusion that there is no classwide method of proving liability in this case. Appellants do not identify any evidence in this record establishing that Ms. Simon was in a position to establish companywide policy for Wet Seal. They also ignore

unequivocal evidence that the e-mails were not widely disseminated in terms of time or place. Indeed, to the extent that these e-mails can be construed as evidence that some Wet Seal employees were coerced to purchase Wet Seal merchandise, they support the trial court's conclusion that assessing liability will require an individualized inquiry.

Alternatively, appellants contend that sales records establishing that employees purchased Wet Seal merchandise during the relevant class period can provide a common method of classwide proof. However, appellants fail to explain how evidence of employee purchases establishes Wet Seal's liability. Evidence that putative class members purchased Wet Seal merchandise is not evidence that they were forced to purchase that merchandise.[9] Ignoring this simple fact, appellants take the position that the reason employees purchased Wet Seal merchandise is irrelevant. To support this contention, appellants rely on *Stuart v. RadioShack Corp.* (N.D.Cal., Feb. 5, 2009, No. C-07-4499 EMC) 2009 U.S.Dist. Lexis 12337, *17–*45 (*Stuart*).

In *Stuart, supra,* 2009 U.S.Dist. Lexis 12337, the plaintiffs challenged RadioShack's policy of denying reimbursement to employees for mileage spent transferring items between stores (the ICST policy). The legality of this ICST policy was a common issue which provided a classwide method of proving liability. Under those circumstances, evidence that some managers had discretion to categorize mileage as some other type of reimbursable expense did not defeat the motion for class certification. As the court explained, "the fact that managers may have had some discretion to determine what ICSTs were incidental and which were not (and thus reimbursable) does not change the fact that the central issue in this case is whether there was a failure to reimburse, which would constitute a violation of the California Labor Code. That is, the issue is not why employees were not reimbursed but whether they were. That legal issue—the legality of failing to reimburse employees for ICSTs—predominates this case. Determining who in fact was reimbursed and who was not will be a straightforward factual question that informs the remedy, and will likely be resolved by documents. Those determinations will not predominate this case." (*Stuart, supra,* 2009 U.S.Dist. Lexis 12337 at pp. *44–*45, italics omitted.)

*Stuart* does not support appellants' contention that the issue in this case is not "why" putative class members purchased Wet Seal, but only "whether" those purchases were made. The issue in *Stuart* was whether evidence of

---

[9] As Wet Seal has argued, employees are given a store discount and may decide to use that discount to purchase Wet Seal merchandise simply because they like it. In this court, appellants contend that "not one employee whose Declaration Defendants obtained supported this argument that if [employees] purchased any merchandise it was simply because they liked it." In fact, several declarations say just that.

variations in the application of a companywide policy defeated a motion for class certification. In that context, the court concluded that individual inquiries as to whether any given class member was or was not denied reimbursement pursuant to the ICST policy was a damages question which did not predominate over the common core issue of liability. Here, by contrast, appellants are attempting to fill an evidentiary void regarding their theory of liability by relying on Wet Seal sales records. The question here is not whether those records might be relevant to the secondary issue of damages, but whether they establish a common method of proving classwide liability. Appellants have not alleged that Wet Seal is liable to the class for permitting its employees to purchase Wet Seal merchandise. Rather, they have alleged that Wet Seal is liable for requiring employees to purchase their merchandise. Thus, in order for evidence of sales records to provide a common method of proving liability, those records would have to demonstrate why the purchases were made.

### 7. *Declarations of Putative Class Members*

Appellants contend that the trial court erred by using the "competing declarations" submitted by the parties to defeat plaintiffs' theory of liability. This argument is factually and legally unsound.

As a factual matter, appellants ignore what happened in this case. Plaintiffs attempted to use the declarations of putative class members as evidence of a companywide policy which could be utilized to extrapolate liability across the class. The court considered that evidence but concluded that it did not serve plaintiffs' intended function. As the court explained: "Plaintiffs have submitted approximately 55 employee declarations showing that the understanding of those employees about Wet Seal's dress code requirements came from oral communications from their respective store managers. The substance of those oral communications according to the declarations proffered by plaintiffs, differed from person to person with different employees having different understandings about Wet Seal's dress code requirements. Therefore, to the extent that plaintiffs claim they are challenging Wet Seal's dress code policy on its face, that claim is belied by plaintiffs' own presentation of evidence."

It was only after making this finding that the court went on to address Wet Seal's declarations which reinforced its conclusion that plaintiffs' theory of liability was not susceptible to common classwide proof but rather "would require individualized inquiries into a myriad of circumstances depending on the particular directions of individual store managers and supervisors at numerous stores in widely varying locations and over the course of many years."

Appellants fail to supply any relevant authority to support their contention that a trial court may not consider the declarations of putative class members under circumstances comparable to this case. Instead they mistakenly rely on *Ghazaryan v. Diva Limousine, Ltd.* (2008) 169 Cal.App.4th 1524 [87 Cal.Rptr.3d 518] (*Ghazaryan*), and *Jaimez v. Daiohs USA Inc.* (2010) 181 Cal.App.4th 1286 [105 Cal.Rptr.3d 443] (*Jaimez*). In both of those cases, the plaintiffs produced substantial evidence of a companywide employment policy and the core liability issue was whether that policy was legal or not. (*Ghazaryan, supra,* 169 Cal.App.4th at p. 1536; *Jaimez, supra,* 181 Cal.App.4th at pp. 1299–1301.) Under those circumstances, declarations describing possible individual variations in the application of the policy may have been relevant to the secondary issue of damages, but that damages issue did not predominate over the common issue regarding the legality of the policy itself. (*Ghazaryan, supra,* 169 Cal.App.4th at pp. 1527–1529; *Jaimez, supra,* 181 Cal.App.4th at pp. 1303–1305.) Here, by contrast, plaintiffs produced declaration evidence in an effort to establish a classwide method of proving liability but, as the trial court found, those declarations are not substantial evidence of an articulable companywide policy which could be used to establish classwide liability.

Wet Seal's written policies, which do not state that employees are required to purchase or wear Wet Seal merchandise, do not provide a classwide method of proving plaintiffs' dress code claim. Therefore, plaintiffs offered other types of evidence including the declarations of putative class members, and they argued that evidence was probative of a classwide illegal practice. Having chosen that litigation tactic, appellants cannot now complain because the trial court considered plaintiffs' proffered evidence and found it lacking.

## C. *The Superiority Requirement*

Appellants challenge the trial court's discretionary determination that a class action is not the superior method of resolving this case.

The trial court found that a class action would not be superior to individual lawsuits primarily because individual factual inquiries would pose over-whelming case management difficulties. The court also found that plaintiffs failed to present a "manageable trial plan" for adjudicating the merits of either the dress code claim or the travel expense reimbursement claim. The court acknowledged that putative class members might be dissuaded from pursuing individual claims because of the small amount of damages involved, but ultimately it found that this factor was not sufficient by itself to compel class certification.

Without specifically challenging any aspect of the trial court's ruling, appellants contend that plaintiffs "have shown that reasonable means to

gather and present sufficiently reliable evidence on classwide issues exist such as Defendants' [own] records." We have already rejected appellants' theory that records of employee purchases of Wet Seal merchandise provide a classwide method of proving liability. In addition, we have affirmed the trial court's finding that Wet Seal's written policies during the putative class period do not supply a classwide method of proving liability. If appellants have some other type of company record in mind, it was incumbent on them to produce that evidence in the trial court.

In their reply brief, appellants contend that a class action would be manageable because " 'representative testimony, surveys, and statistical analysis all are available as tools to render manageable determinations of the extent of liability. [Citations.]' " (Quoting *Brinker, supra*, 53 Cal.4th at p. 1054 (conc. opn. of Werdegar, J.).) In this case, we are not concerned with determinations regarding the "extent of liability," but more fundamentally with *the fact* of liability.

■ Furthermore "[i]t is not sufficient, in any event, simply to mention a procedural tool; the party seeking class certification must explain how the procedure will effectively manage the issues in question . . . ." (*Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1432 [47 Cal.Rptr.3d 83].) In the present case, appellants do not explain how their list of procedural tools can be used to effectively manage a class action in this case.

D. *Evidentiary Rulings*

Appellants contend that the trial court committed reversible error by making a blanket ruling pursuant to which it overruled all but one of plaintiffs' objections to Wet Seal's evidence.

This claim of error is void of factual analysis; appellants fail to identify any specific piece of Wet Seal evidence that was either erroneously admitted or that caused them prejudice. For this reason alone, this claim of error fails. (See, e.g., *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 [50 Cal.Rptr.3d 398] ["One cannot simply say the court erred, and leave it up to the appellate court to figure out why."]; *In re Marriage of Schroeder* (1987) 192 Cal.App.3d 1154, 1164 [238 Cal.Rptr. 12] ["court is not inclined to act as counsel for . . . any appellant and furnish a legal argument as to how the trial court's rulings in this regard constituted an abuse of discretion"].)

Furthermore, appellants rely solely on *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243 [100 Cal.Rptr.3d 296] (*Nazir*), which is inapposite. In *Nazir*, this court reversed summary judgment in an employment discrimination case. In reaching our decision, we held that the trial court erred by making a blanket ruling *sustaining* all but one of the defendants' 764 objections to plaintiff's evidence. (*Id.* at p. 254.) We reasoned that the blanket ruling provided no meaningful basis for review and could in fact be treated as a failure to rule. We also reviewed the objections themselves and concluded that most were either unsupported by any rule or were patently frivolous. (*Id.* at pp. 255–257.) Under those circumstances, we concluded that all of plaintiff's and defendants' evidence was properly before us and that the admissible evidence created triable issues of fact precluding summary judgment. (*Id.* at pp. 257, 264.)

 Appellants contend that *Nazir* precludes a trial court from making a general ruling overruling a set of objections to proffered evidence and requires instead that the court provide a reason for every evidentiary objection that it overrules. In making this argument, appellants simply ignore the fundamental difference between overruling an evidentiary objection and sustaining one. For example, in the former context, which describes this case, the evidence becomes part of the record and is subject to further scrutiny and review. Here, no such review is required since appellants fail to identify any evidence that was allegedly improperly admitted. Regardless, we strongly reject appellants' notion that *Nazir* requires the trial court to provide a separate reason for every evidentiary objection that it overrules when, as here, the court is inundated with objections under circumstances suggesting an abuse of the litigation process.

Appellants separately contend that the trial court violated *Nazir* by making a ruling that Wet Seal's objections to plaintiffs' evidence were " 'largely meritorious' " and " 'should be sustained.' " In fact, the trial court found that, although many of the defendants' objections to plaintiffs' evidence were valid, all of plaintiffs' evidence would be admitted and considered. Since this ruling favored appellants, they have no complaint on appeal. (*Marich v. MGM/UA Telecommunications, Inc.* (2003) 113 Cal.App.4th 415, 431 [7 Cal.Rptr.3d 60].)

## IV. DISPOSITION

The order denying class certification is affirmed.

Kline, P. J., and Richman, J., concurred.

Appellants' petition for review by the Supreme Court was denied January 23, 2013, S206370.