Filed 2/26/14  Lopez v. Pacific Bell CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| EMANUEL "MANNY" LOPEZ et al., | |
| Plaintiffs and Appellants, | |
| v. | A135589 |
| PACIFIC BELL TELEPHONE COMPANY, | (Alameda County Super. Ct. No. RG10523628) |
| Defendant and Respondent. | |

Emmanuel "Manny" Lopez and Kelvin Session (collectively plaintiffs), on behalf of themselves and all others similarly situated, appeal from an order denying their motion for class certification, in this action against their former employer Pacific Bell Telephone Company (Pacific Bell).  Plaintiffs, who formerly worked for Pacific Bell as Door to Door Sales Executives (sales executives) sought to represent and certify a class of almost 600 current and former sales executives who allegedly were not fully indemnified for their mileage expenses and a subclass of approximately 200 sales executives who were temporarily assigned to work at AT&T Mobility Stores (mobility stores) and who were allegedly misclassified as exempt from California's overtime laws and regulations.

1

On appeal, plaintiffs first contend the trial court abused its discretion in refusing to certify a class related to the indemnification of sales executives, in that common questions predominate as to whether Pacific Bell (1) had a commute mileage deduction policy that was unlawful as to all sales executives, and (2) had a systematic practice that resulted in a failure to fully reimburse sales executives' mileage expenses.[1] Plaintiffs further contend the trial court abused its discretion when it refused to certify a subclass of sales executives who worked at mobility stores and were misclassified as exempt.

We shall affirm the trial court's order denying class certification.

### FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Lopez was employed by Pacific Bell as a sales executive[2] from January 2008 through May 2009. Plaintiff Session was employed by Pacific Bell as a sales executive from March 2008 through February 2009. As sales executives, their job was to go door to door in residential neighborhoods selling AT&T "U-verse" services and products, including internet, telephone, and cable. Sales executives work in particular geographic markets, which, in 2007, included San Diego, Los Angeles, Sacramento, Fresno, and Northern California. In 2008, the Sacramento and Fresno markets were made part of the Northern California market. In each market, area managers supervise sales coach managers, who directly supervise sales executives.

On July 6, 2011, plaintiffs filed a first amended complaint seeking damages, reimbursement, and injunctive and declaratory relief. In their class action lawsuit, they first alleged that Pacific Bell failed to reimburse them for all expenses they incurred during the course of their employment as sales executives. These expenses included mileage expenses that Pacific Bell actually or constructively knew plaintiffs had incurred and mileage expenses plaintiffs were improperly required to deduct for commute miles

---

[1]Plaintiffs also argue on appeal that the trial court should have certified a subclass of Southern California sales executives who were subject to a cap on the amount of mileage reimbursement they could request, although this proposed subclass was not included in their motion for class certification.

[2]Sales executives were previously called home solutions managers.

not actually driven. Plaintiffs alleged that all other current and former sales executives were similarly deprived of mileage expense reimbursement. Plaintiffs further alleged that Lopez was required to work at mobility stores for several months, during which time he was misclassified as exempt and therefore did not receive minimum, regular, and overtime wages, or meal and rest periods, to which he was entitled. Plaintiffs alleged that other current and former sales executives who worked at mobility stores were similarly deprived of wages and meal and rest breaks.

Based on these factual allegations, plaintiffs asserted nine causes of action: (1) failure to pay wages and overtime in violation of Labor Code sections 204 and 510;[3] (2) failure to pay minimum wages in violation of sections 1182.12, 1194, 1194.2, and 1197; (3) failure to pay all wages upon separation in violation of sections 201, 202, and 203; (4) failure to provide meal and rest periods and/or wages in lieu thereof in violation of section 226.7; (5) failure to provide accurate wage statements and maintain accurate pay records in violation of section 226, subdivisions (a), (e), and (g); (6) failure to reimburse expenses in violation of section 2802, subdivisions (a) to (c); (7) unfair business acts and practices in violation of Business and Professions Code sections 17200, et seq.; (8) unjust enrichment; and (9) declaratory relief.

On August 17, 2011, plaintiffs filed a motion for class certification in which they asked the trial court to certify an indemnity class of 586 people, which included "[a]ll employees of [Pacific Bell] that held or hold the title of Home Solutions Manager or Door to Door Sales Executive in the State of California from July 2, 2006 through the present . . . ." Plaintiffs also moved for certification of a mobility store subclass of some 200 people, which included "[a]ll members of the above described class who worked in AT&T Mobility Stores during the period October 2008 through May 2009 . . . ." Plaintiffs submitted documentary and testimonial evidence in support of the motion for

---

[3]All further statutory references are to the Labor Code unless otherwise indicated.

3

class certification, and Pacific Bell submitted similar evidence in support of its opposition.[4]

On May 11, 2012, the trial court denied the motion for class certification. Although it found that plaintiffs had satisfied their burden of showing numerosity, ascertainability, and adequacy of representation, it concluded that common issues of fact and law did not predominate.

On June 1, 2012, plaintiffs filed a notice of appeal.

## DISCUSSION

### I. *Guiding Principles Related to Class Certification*

Recently, in *Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*), the California Supreme Court summarized the general requirements for certification of a class: "The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives. (Code Civ. Proc., § 382; [citations].) 'In turn, the "community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' [Citations.]"

In this case, as in *Brinker*, the disputed question is whether individual or common questions predominate. As the *Brinker* Court explained: "The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' [Citations.] The answer hinges on 'whether the theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' [Citation.] A court must examine the allegations of the

---

[4]We will summarize the evidence of both parties in parts II. and III., *post*, of this opinion.

4

complaint and supporting declarations [citation] and consider whether the legal and factual issues they present are such that their resolution in a single class proceeding would be both desirable and feasible. 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at pp. 1021–1022, fn. omitted.)

*Brinker* described the appellate court's inquiry on review of a class certification order as "narrowly circumscribed. 'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion: "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification." [Citation.] A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions. [Citations.]' [Citations.] Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence. [Citation.] We must '[p]resum[e] in favor of the certification order . . . the existence of every fact the trial court could reasonably deduce from the record . . . .' [Citation.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

## II. *Indemnity Class*

Plaintiffs contend the trial court abused its discretion in refusing to certify a class of nearly 600 current and former sales executives who allegedly were not fully reimbursed for their mileage expenses. According to plaintiffs, common questions of law or fact predominate as to whether Pacific Bell (1) has an unlawful commute deduction policy, and (2) systematically fails to reimburse sales executives for their mileage expenses.

In California, an employer is required to indemnify each employee for "all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties . . . ." (§ 2802, subd. (a).) The California Supreme Court

5

has held that this requirement includes reimbursement for automobile expenses incurred by the employee. (*Gattuso v. Harte-Hanks Shoppers, Inc.* (2007) 42 Cal.4th 554, 567–568 (*Gattuso*).) The "mileage reimbursement method" is one of the permissible methods "to determine the amount of reimbursement due under section 2802 for work-required use of an employee's own automobile, [pursuant to which] the employee need only keep a record of the number of miles driven to perform job duties. The employee submits that information to the employer, who then multiplies the work-required miles driven by a predetermined amount that approximates the per-mile cost of owning and operating an automobile." (*Id*. at p. 569.)

## A.  *Factual Background*

### *Plaintiffs' Evidence*

Plaintiffs submitted a variety of evidence, including documentary evidence; declarations; and the deposition testimony of plaintiffs, other sales executives, and Pacific Bell's managers, in support of their class certification motion. This evidence was intended to demonstrate both that Pacific Bell has a policy that requires sales executives to deduct their commute mileage from any reimbursement requests regardless of whether they made that commute, and that it utilizes systematic practices resulting in under-reimbursement of sales executives for mileage expenses.

Plaintiffs' evidence related to the commute deduction included the following. Sales executives must use a vehicle for their job, to enable them to travel between streets and neighborhoods while working. Sales executives sometimes carpool together, but not often.

Sales executives are required to deduct the miles for the normal commute to and from their assigned AT&T office each day from their mileage reimbursement requests. This commute deduction applies whether the employees actually go to their office on a given day or whether they drive straight from their home into the field, as many sales executives do. Also, many sales executives do not have any personal space assigned to them at their home offices, and work primarily out of their cars. There is also great variation as to how often a particular sales executive goes to his or her assigned office.

6

For example, one sales executive testified that he went into the office between one and five times a week. Others testified that they went into their offices with varying frequency as well.

This automatic commute deduction policy leads to significant unreimbursed mileage expenses for some sales executives. For example, a sales executive who lived close to his assigned home office in Riverside was reimbursed for most of his mileage expenses because his commute deduction was small. When he was later assigned to the Anaheim office, he was only eligible for mileage reimbursement if he drove further than his approximately 100-mile daily commute.

Plaintiffs' evidence related to other mileage reimbursement issues included the following. Plaintiffs submitted Bay Area manager Magaly Orozco's year-end summary of mileage reimbursement for her team, which showed that 24 out of 75 people had not requested mileage reimbursement in December. In an accompanying email, Orozco indicated that everyone's mileage had been submitted except "some folks that just claim [it] on their taxes that don't submit mileage."[5]

Plaintiffs submitted additional evidence showing that Pacific Bell's mileage reimbursement policies and practices allow or encourage sales executives to use online mapping programs, such as MapQuest or Google Maps, to calculate their mileage, even though managers know that odometer use is the most accurate way to track mileage. Using a mapping program has led to the loss of miles sales executives drive for things such as breaks or meetings.

---

[5]To show that sales executives do not claim a mileage deduction on their tax returns by choice, plaintiffs refer to the deposition testimony of plaintiff Kelvin Session, who testified that he twice attempted to get assistance from his manager regarding how to request mileage reimbursement, but each time his manager was too busy to help him. Session "just threw [his] hands up and just tried to focus on some other things." He then went out on a disability leave. In a declaration, Session further stated that he planned to pursue reimbursement when he returned from disability leave, but was laid off before he returned to work. He therefore provided his tax preparer with a summary of the miles driven during his employment, less his commute deduction.

7

Plaintiffs also submitted evidence to demonstrate that Pacific Bell has placed express caps on mileage reimbursement for sales executives in Southern California. In San Diego, one version of a "Mileage Voucher Help Sheet" that manager Ivan Gil provided to sales executives as an attachment to emails dated between February 9, 2010 and December 14, 2010, stated: "Voucher cannot exceed $500/mo." A later version of the same form, also attached to emails from Ivan Gil, and dated between March 25, 2011 and August 18, 2011, placed the dollar limit at $300 per month. Both versions of the document also stated: "Please be sure not to abuse this as it is a benefit our company provides and is not mandated by law." Sales executives in San Diego were told by managers that their mileage reimbursement requests should not go above either $500 or $300, at different times. This prevented them from being fully reimbursed for their mileage expenses.

San Diego area manager Yvette Burnett attached to her supplemental declaration a sales executive's expense report for April 2008, which contained a notation showing that she had previously rejected the sales executive's mileage reimbursement request because "[I] can't approve anything over $500." The new expense report contained a reimbursement request in the amount of $499.95, which was approved.[6]

In the Los Angeles area, a former sales executive was told not to submit mileage reimbursement requests that exceeded $500. As he stated in his declaration, his managers told his team that they would be seen as a liability if their mileage reimbursement requests were too high. The managers said that the "mileage reports had to be no more than $500 per month." When he resigned, that sales executive wrote in his resignation email that he was glad he had gotten a new job where he would "no longer have to shave miles off [his] mileage report in order to avoid termination."

---

[6]In her declaration, Burnett stated that she did not recall any rule or policy that sales executives could not obtain reimbursement of mileage in an amount over $500, although she might examine such a request for accuracy, since the geographic area of the San Diego market is relatively small.

A Northern California sales coach manager declared that sales executives were told they were "going to run into problems" if their mileage claims were too high. This could happen if they submitted mileage requests for two different months at one time. In the Southern California area, a sales executive was told that some miles were considered excessive and were not allowed.

*Pacific Bell's Evidence*

In support of its opposition to plaintiffs' motion, Pacific Bell submitted evidence, including documentary evidence, declarations, and the deposition testimony of Pacific Bell managers, as well as declarations and deposition excerpts of plaintiffs and other sales executives, to show that any failure to fully reimburse sales executives for their mileage turned on individualized facts.

Pacific Bell's evidence related to the commute deduction included the following. Sales executives are required to have a means of transportation to the area to which they are assigned to work on any given day, but they do not have to drive their own car. They can also carpool, and some do so. Some sales executives carpool only occasionally, such as the sales executive who declared that he carpooled with a coworker one to three times per month. Some carpool within a designated area as part of the "buddy system," required by a certain manager who wants sales executives to work together as a team. Others carpool more regularly, such as a sales executive who carpooled regularly for an entire year or one who, during some months, carpooled daily for the whole month.

Mary Logan, Pacific Bell's lead cost accountant, stated in a declaration that AT&T's Global Travel and Expense Policy, which is posted on Pacific Bell's intranet and is available to all employees, has provided at all relevant times that Pacific Bell reimburses employees for use of personal vehicles for business travel at the IRS reimbursement rate.[7] Logan further stated that the policy provides that "[m]ileage is not

_____

[7]Although the policy has been modified over the years, Logan stated that the pertinent provisions have not changed in the years covered by this lawsuit. The AT&T Global Employee Expense Policy was attached as an exhibit to Logan's declaration as

9

reimbursable for an employee's normal round trip to and from work.  If an employee travels to a business destination that is different than his or her office, the employee must deduct the normal home-to-office commute from his or her mileage reimbursement request."[8]

Evidence submitted by Pacific Bell also showed that there is wide variation as to how often sales executives report to their assigned home office.  Some go into their assigned office every work day, while others do so a few times a week and others only once a week or less.  Also, for some sales executives, how often they go to their office varies from week to week.

During their commute to work, sales executives are generally free to run personal errands and drive whatever route they choose, regardless of whether they go first to their office or directly to their designated area for conducting sales.  They also are at times permitted to set their own work schedules or to attend meetings by phone to accommodate their personal schedules.  Sales executives do not necessarily check in with their managers during their workday, such as when they move from one designated sales area to another.

Pacific Bell's evidence related to reimbursement for mileage expenses included the following.  Lead cost accountant Logan stated in her declaration that, to obtain mileage reimbursement, the global travel and expense policy requires that employees submit an expense report on Pacific Bell's mileage reimbursement system, called ExpenseNet.  The reimbursement request must include the purpose of the trip, the date, the starting point and destination of each trip, and the number of miles driven, less the normal daily commute.  The policy further provides that mileage reimbursement requests

_____

was the subsequent Global Travel and Expense Policy, which combined travel and expense policies into one policy in January 2011.

[8]A Pacific Bell manager explained that employees' place of work, for purposes of the commute deduction, is their assigned home office, regardless of the distance of that office from an employee's designated area for conducting sales.

must be submitted within three months from the date the expense is incurred " 'unless otherwise dictated by applicable law.' "[9]

Logan stated that there is "no set limit as to how much an employee can seek and receive for mileage reimbursement nor has there been any such limit during the five years I have been responsible for supporting the administration of the Policy. Employees are entitled to receive reimbursement for all miles traveled for business related reasons, less their normal commute to and from the office."

Pacific Bell submitted other evidence showing that there is no preset limit on the amount a sales executive may request for mileage reimbursement, although a request for more than $500 could result in an automatic audit. A Los Angeles area manager therefore recommended that sales executives submit two separate vouchers if they believed they would exceed $500 in mileage expenses in a given month. In the San Diego area, however, some sales executives were given a "Mileage Voucher Help Sheet," which stated that a voucher could not exceed $500, and later were given a similar document that said a voucher could not exceed $300. According to San Diego area managers, these were amounts that could trigger an audit of a reimbursement request in San Diego, rather than pre-set limits on how much mileage reimbursement a sales executive could receive.

Sales executives receive training on reimbursement request procedures from various sources. For example, new hires are trained on mileage reimbursement during the "on-boarding" process. Some sales executives receive follow-up training on how to complete mileage reports during one-on-one sessions with their direct supervisor. Some managers also provide additional training on mileage reimbursement at weekly or monthly meetings. Northern California managers provide sales executives with written directions regarding how to enter reimbursement requests into the ExpenseNet system. Supervisors regularly meet with sales executives and answer their questions related to

---

[9]Evidence submitted by Pacific Bell showed that California area managers consistently have approved reimbursement requests submitted more than three months after the expense was incurred.

11

submitting mileage reimbursement requests.  In addition, many managers regularly remind sales executives—through emails and text messages, on conference calls, and at regular team meetings—to submit their mileage, and will check in with them if they fail to submit reimbursement requests for a particular month.

Training on the method of tracking mileage varies based on the trainer or the geographic area, or both.  A Los Angeles area sales manager, for example, "inform[ed] all new hires that the best way to keep track of their mileage is [to] record their odometer reading at the start of the business day and then again at the end of the business day."  One Northern California area manager stated that she never instructed sales executives on how to calculate the miles they traveled, and she never heard any coach managers say that sales executives could not use odometer readings.  Another upper level manager in Northern California recommended to sales executives that they use an odometer to track their miles, but this was not required and use of MapQuest or Google Maps was also acceptable.  A Central Valley sales coach stated that sales executives "can use their odometer, MapQuest or Google Maps to keep track of their mileage, whatever they find to be most convenient."  In San Diego, some managers train sales executives to use an odometer to compute mileage, while others train them to use a mapping program, though they never are prohibited from using the odometer.   Beginning in May 2011, San Diego managers "informed Sales Executives that they must provide odometer readings if they seek reimbursement for over 600 miles in any month."

Finally, some sales executives do not submit mileage expense reports every month for various reasons, including because they do not want to take the time to fill out the mileage expense report, because their designated sales area is closer to their home than the normal commute to their assigned office, or because they carpooled with other sales executives and did not incur any mileage expenses.

### B. *Legal Analysis*

### 1. *The Commute Deduction*

Plaintiffs contend the trial court abused its discretion when it (1) examined the merits of their commute deduction claim, (2) found that the lawfulness of the commute

deduction depended on employer control, and (3) found that individual questions predominate regarding whether Pacific Bell improperly failed to reimburse sales executives for their commute.

In its ruling on the commute deduction, the trial court explained that plaintiffs had not "provided any direct authority for the proposition that when a personal vehicle is required to perform job duties, which use is clearly compensable under [section] 2802, then the employee owner of the personal vehicle is also entitled to compensation for his or her commute miles." [10] Nor had Pacific Bell provided any direct authority to the contrary, although it had "provided persuasive authority for the correlation by analogy of rules regarding the payment of wages for travel time to rules regarding reimbursement of travel expenses."

"Because resolution of this legal issue is necessary to a determination of whether class certification is proper," the court concluded that "a limited examination of the merits of Plaintiffs' theory of recovery is warranted, and [found] that, for the purpose of determining the parameters of the mileage for which the [sales executives] are entitled to reimbursement, and in the absence of binding California direct authority on this issue, the proper analogy to be drawn is to the rules that have been developed regarding payment of wages for commute time," which required an inquiry into the question of "employer control" of the employee during the commute.

The trial court then concluded: "Viewed through the same lens that would be utilized for an examination of 'employer control,' the varied evidentiary record shifts the focus of the inquiry to the manner in which the commute deduction is applied to each [sales executive] individually, and whether such application results in either under-reimbursement or non-reimbursement of the mileage expenses to which they are entitled. As the court further explained, even assuming plaintiffs could establish that sales

---

[10]The court rejected plaintiffs attempt to analogize the required vehicle exception to the "going and coming rule" discussed in *Lobo v. Tamco* (2010) 182 Cal.App.4th 297, 302–303, a case involving application of respondeat superior and the going and coming rule to an employee driver's negligence in causing a fatal accident. Plaintiffs do not raise this theory on appeal.

13

executives' use of a personal vehicle was required, despite conflicting evidence on that point, the evidence showed "wide variations in the travel patterns of [sales executives], including whether and/or how often and when they reported to their home offices, and on those occasions when they reported directly to a field work location from home, whether this amounted to a longer or a shorter drive than the distance between their homes and their assigned home offices. These questions are clearly individualized in nature. In sum, individual issues regarding the application of the commute deduction predominate."

### a. *Trial Court's Consideration of the Merits*

In *Brinker*, *supra*, 53 Cal.4th 1004, 1023, our Supreme Court addressed the propriety of evaluating the merits of a claim as part of the class certification determination. The *Brinker* court rejected the appellate court's holding that a trial court must always address the merits of a claim to determine whether individual or common elements predominate. As the high court explained, the question of certification is " 'essentially a procedural one that does not ask whether an action is legally or factually meritorious.' " (*Ibid.*) A class certification motion, therefore, "is not a license for a free-floating inquiry into the validity of the complaint's allegations; rather, resolution of disputes over the merits of a case generally must be postponed until after class certification has been decided [citations], with the court assuming for purposes of the certification motion that any claims have merit [citation]." (*Ibid*.)

The court observed, however, that " 'issues affecting the merits of a case may be enmeshed with class action requirements. . . .' [Citations.]" (*Brinker*, *supra*, 53 Cal.4th at p. 1023, citing, inter alia, *Wal-Mart Stores, Inc. v. Dukes* (2011) 131 S.Ct. 2541, 2551 [analysis of propriety of a class certification "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped"].) Therefore, "[w]hen evidence or legal issues germane to the certification question bear as well on aspects of the merits, a court may properly evaluate them. [Citations.] The rule is that a court may 'consider[] how various claims and defenses relate and may affect the course of the litigation' even though such 'considerations . . . may overlap the case's merits.' [Citations.]

"In particular, whether common or individual questions predominate will often depend upon resolution of issues closely tied to the merits. [Citations.] To assess predominance, a court 'must examine the issues framed by the pleadings and the law applicable to the causes of action alleged.' [Citation.] It must determine whether the elements necessary to establish liability are susceptible of common proof or, if not, whether there are ways to manage effectively proof of any elements that may require individualized evidence. [Citation.] In turn, whether an element may be established collectively or only individually, plaintiff by plaintiff, can turn on the precise nature of the element and require resolution of disputed legal or factual issues affecting the merits. . . . [¶] Such inquiries are closely circumscribed. . . . [A]ny 'peek' a court takes into the merits at the certification stage must 'be limited to those aspects of the merits that affect the decisions essential' to class certification. [Citation.]" (*Brinker*, at pp. 1023–1024; see also *Comcast Corp. v. Behrend* (2013) 133 S. Ct. 1426, 1432 [analysis of whether common questions predominate will frequently overlap with the merits of plaintiff's underlying claims] (*Comcast*).)

*Morgan v. Wet Seal, Inc.* (2012) 210 Cal.App.4th 1341 (*Wet Seal*) is an example of a case in which the trial court considered the merits of a claim solely to assist in the class certification decision. There, the trial court denied the class certification motion of the plaintiffs, former employees of a retail chain, in their lawsuit challenging the defendant's purportedly unlawful policies related to an employee dress code and travel reimbursement. (*Id*. at p. 1344–1345.) The trial court based its denial on a finding that common questions did not predominate over individual questions with respect to either claim. (*Id*. at pp. 1344–1345.) On appeal, the plaintiffs contended, inter alia, that the trial court had improperly based its decision on a substantive evaluation of the merits of their legal claims. (*Id*. at p. 1358.)

A panel of this division held that the trial court properly "considered the merits of plaintiffs' causes of action only for the limited purpose of assessing whether substantially similar questions were common to the class and predominated over individual questions . . . ." (*Wet Seal*, *supra*, 210 Cal.App.4th at p. 1359.) For example, in response

15

to the plaintiffs' complaint that the trial court should not have considered the legal definition of "uniform" for purposes of deciding the commonality question as to the dress code claim, we explained that the plaintiffs "simply ignore the reason the trial court consulted these legal authorities, i.e., in order to determine whether there was a common legal issue, not to make a substantive ruling regarding the merits of plaintiffs' legal claim." (*Id*. at pp. 1359–1360)

Here too, the trial court did not reflexively and prematurely render a substantive ruling on the merits of plaintiffs' legal claim regarding the commute deduction. Instead, as in *Wet Seal*, it was necessary for the court to resolve threshold legal questions regarding the circumstances in which a commute deduction would be unlawful and what proof would be required to establish liability before it could address whether common or individual questions predominated. (See *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1361–1362; see also *Comcast, supra*, 133 S. Ct. at p. 1433; *Brinker*, *supra*, 53 Cal.4th at p. 1024.) A " 'peek' " at the law related to the commute deduction was thus a necessary prelude to the court's determination of whether class certification was appropriate. (*Brinker*, at p. 1024.)

Plaintiffs cite two cases, each of which they assert is analogous to the present matter, in which the trial court had inappropriately considered the merits in determining whether to certify a class. First, in *Jaimez v. DAIOHS, USA, Inc.* (2010) 181 Cal.App.4th 1286, 1299–1300 (*Jaimez*), the trial court denied the plaintiff's motion for class certification in an action against his employer alleging misclassification of employees as exempt, as well as wage and hour violations. In reversing the trial court's order, the Court of Appeal found that the trial court had incorrectly focused on the merits of the declarations submitted by the parties, "evaluating the contradictions in the parties' responses to the company's uniform policies and practices, not the policies and practices themselves." (*Id*. at p. 1300.) Had the trial court properly focused on the plaintiff's theory of recovery, which involved uniform policies applicable to all putative class members, it would have found that the employer's declarations, "while identifying individual effects of polices and practices that may well call for individual damages

16

determinations, nevertheless confirm the predominance of common legal and factual issues that make this case more amenable to class treatment." (*Ibid.*)

Second, in *Hewlett-Packard Co. v. Superior Court* (2008) 167 Cal.App.4th 87, 89–90 (*Hewlett-Packard*), computer purchasers brought an action against Hewlett-Packard alleging that the company had breached an express warranty when it knowingly sold computers with a manufacturing defect. On appeal from the trial court's order granting the plaintiffs' motion for class certification, Hewlett-Packard (HP) asserted that individual issues would predominate because, to determine liability, the court would have to consider whether each purchaser discovered the defect before expiration of the express warranty. (*Id.* at p. 94.)

The appellate court disagreed, explaining: "whether or not the alleged defects occurred during the warranty period does not affect a finding of community of interest in the present case. Plaintiffs here allege a common defect in the HP notebook computers and their display screens. In order to prove that defect, plaintiffs will present evidence of call records reporting dim displays, records of repairs of faulty inverters, service notes documenting defects that were known to HP, and an HP policy that all notebooks returned for any reason would have their inverter repaired, regardless of whether the screen actually failed. A jury could find, based on this evidence, that the inverters in question were defective and that HP is liable for the defect. The issue of whether the inverters were defective is appropriate for a joint trial with common proof. For example, if the jury finds that the inverters were defective, then each plaintiff would not need to separately prove that his or her inverter was defective, only that he or she had a computer that contained that type of inverter." (*Hewlett-Packard*, *supra*, 167 Cal.App.4th at p. 96.) The appellate court therefore rejected HP's request "that we order the trial court to vacate its order certifying the class because some of the plaintiffs' claims may be substantively invalid under [legal authority related to the warranty period question]. This is not a proper consideration on the question of class certification. The merits of the case can and will be decided at a later point in this case." (*Hewlett-Packard*, at p. 96; compare *Bomersheim v. Los Angeles Gay and Lesbian Center* (2010) 184 Cal.App.4th 1471, 1485

[appellate court needed to address whether causation existed to determine whether common questions predominated in medical negligence action regarding health center's treatment of patients with wrong medication, and concluded that "[a] reasonable inference as to the entire class is that the initial mistreatment caused members to seek retreatment. Causation can therefore be presumed on common proof"].)

Plaintiffs argue that this case is similar to *Jaimez*, *supra*, 181 Cal.App.4th 1286, 1300–1301, in which individual issues regarding, for example, whether employees actually took their 30-minute meal periods did not defeat class certification in light of the employer's common practice of deducting 30 minutes from each employee's shift regardless of whether they took a meal break, as well as to *Hewlett-Packard*, *supra*, 167 Cal.App.4th 87, 96, in which the court held that, even though Hewlett-Packard's liability to particular class members might depend on whether alleged defects occurred during the warranty period, there was nevertheless a common question regarding whether a particular computer part was defective. Likewise, according to plaintiffs, individual differences between sales executives in this case regarding whether they actually made the drive between their home and their assigned AT&T office were irrelevant to the question of class certification, in light of the common policy being challenged.

Here, however, unlike in *Jaimez* and *Hewlett-Packard*, there was no established law on questions related to mileage reimbursement for sales executives' commutes. The court therefore had to make a threshold judgment regarding what proof would be needed to establish a right to mileage reimbursement during the commute before it could determine whether common or individualized questions would predominate. The court then concluded that individual differences among sales executives' commute patterns did not merely lead to individual questions of damages, but to individual questions of liability. (See *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1369 ["[i]n this case, we are not concerned with determinations regarding the 'extent of liability,' but more fundamentally with *the fact* of liability"].)

In short, the trial court did not err in briefly considering the merits of the commute deduction claim solely to determine whether common or individual questions

18

predominated as to that claim. (See *Brinker*, *supra*, 53 Cal.4th at p. 1024; *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1360.)

### b. *Trial Court's Findings Regarding the Lawfulness of the Commute Deduction*

Plaintiffs next argue that, even assuming some preliminary consideration of the merits was warranted, the trial court incorrectly concluded that the lawfulness of Pacific Bell's policy of deducting sales executives' normal commute from their mileage reimbursement depended on the extent of Pacific Bell's control over each employee during his or her commute.

In considering the merits, the trial court first found that there was no "binding California direct authority" on the question of commute mileage reimbursement. Then, for purposes of determining the parameters of the mileage for which sales executives are entitled to reimbursement, the court analogized the existing law regarding an employer's obligations to pay wages for work-related *travel time* with the question of its obligation to reimburse for work-related *travel expenses*.

Federal district courts have drawn similar analogies. For example in *Stuart v. RadioShack Corp.* (N.D.Cal. 2009) 641 F.Supp.2d 901, 904 (*Stuart II*), the court discussed the appropriateness of analogizing reimbursement of expenses under section 2802 with overtime cases: "Reimbursement for expenses is comparable to a wage. In both situations, an employee is owed compensation for services or acts performed for the employer's benefit. In both situations, the compensation is, under governing statutes, owed as a matter of right once incurred or accrued. Both obligations are subject to an anti-waiver provision—i.e., under California law there is an anti-waiver provision for wages just as there is for reimbursement. [Citations.]"

In *Morse v. Servicemaster Global Holdings Inc.* (N.D.Cal. June 21, 2011, No. C 10-00628 SI) 2011 WL 2470252, at page 4 (*Morse*), the district court acknowledged the statement in *Gattuso* that "wages and expense reimbursement are conceptually distinct and subject to different statutory and sometimes also contractual constraints." (*Gattuso*, *supra*, 42 Cal.4th at p. 572.) The *Morse* court found, nonetheless, that "rules regarding

the payment of wages are often used to develop rules regarding reimbursement by way of analogy." (*Morse*, at p. 4.)

Here, the court relied primarily on rules relating to wages for commute time set forth in *Morillion v. Royal Packing Co.* (2000) 22 Cal.4th 575, 578 (*Morillion*), in which our Supreme Court held that farm workers were entitled to compensation for the time they traveled on their employer's buses from a central departure point to the fields where they were to work. Fundamental to the court's analysis and holding was the level of control the employer exercised over its employees "by determining when, where, and how" the employees must travel. (*Id*. at p. 586.) As the court explained: the employer "required plaintiffs to meet at the departure points at a certain time to ride its buses to work, and it prohibited them from using their own cars, subjecting them to verbal warnings and lost wages if they did so. By ' "direct[ing]" ' and ' "command[ing]" ' plaintiffs to travel between the designated departure points and the fields on its buses, [the employer] ' "control[led]" ' them within the meaning of 'hours worked' under subdivision 2(G) [of Industrial Welfare Commission wage order No. 14-80]. [Citation.]" (*Id*. at p. 587.)

The *Morillion* court distinguished "between travel that an employer specifically compels and controls," and "an ordinary commute that employees take on their own." (*Morillion*, *supra*, 22 Cal.4th at p. 587.) The court observed that, during the bus ride, the farm workers "could not drop off their children at school, stop for breakfast before work, or run other errands requiring the use of a car. [They] were foreclosed from numerous activities in which they might otherwise engage if they were permitted to travel to the fields by their own transportation." (*Id*. at p. 586.) In contrast, "employees who commute to work on their own decide when to leave, which route to take to work, and which mode of transportation to use. By commuting on their own, employees may choose and may be able to run errands before work and to leave from work early for personal appointments. The level of the employer's control over its employees, rather than the mere fact that the employer requires the employees' activity, is determinative. [Citation.]" (*Id*. at pp. 586–587.)

20

The trial court in this case also cited *Sullivan v. Kelly Services Inc.* (N.D.Cal., Oct. 16, 2009, No. C 08-3893 CW) 2009 WL 3353300, at page 5 (*Sullivan*), in which the district court addressed the question of control discussed in *Morillion* to determine whether an employee of a temporary agency who traveled to and from job interviews in her own vehicle was entitled to be paid for her travel time. The *Sullivan* court found that, because the employer did not control the manner in which the employee traveled to and from the interviews, that travel time amounted to a non-compensable commute. (*Sullivan*, at p. 5.) As particularly relevant here, the *Sullivan* court further concluded that, because the travel time was not compensable, the employee's mileage and other transportation costs were not subject to reimbursement under section 2802 since they "were not incurred within the scope of her employment." (*Id*. at p. 7.)

Plaintiffs' primary objection to the trial court's reliance on *Morillion* and similar travel compensation cases arises from their disagreement with the reasons the court found it necessary to analyze the law relevant to the commute deduction issue in the first instance, i.e., because Pacific Bell's commute deduction policy is not unlawful on its face and the applicable law on the issue was not clear. But, as we have already concluded (see pt. II., B., 1., a, *ante*), the court properly found that the policy was not unlawful on its face and the applicable law was not clear. Thus, an attempt to discern what law would be relevant to resolving the commute deduction claim was necessary before the court could determine whether that claim was amenable to class-wide treatment. (See *Comcast*, *supra*, 133 S.Ct at p. 1433; *Brinker*, *supra*, 53 Cal.4th at p. 1024; *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1361.)

Plaintiffs further assert that, even assuming *Morillion* and similar travel compensation cases are applicable to travel expense reimbursement, they "all refer to employees who *made the commute* for which they sought payment," whereas, here, sales executives "are seeking reimbursement for the deduction of a 'commute' they did not

21

make."[11]  However, in a 2003 Division of Labor Standards (DLSE) opinion letter, an attorney for the Labor Commissioner explained how to measure travel time compensation for employees with alternative work sites:  "The travel time is measured by the difference between the time it normally takes the employee to travel from his or her home to the assigned work place and the time it takes the employee to travel from home to the distant work site.  This could calculate to no commute time if, for instance, the travel time is less from the employee's home to the distant work site than the normal commute travel time by the employee."  (Cadell, Dept. of Industrial Relations (April 2003) Opinion Letter No.2003.04.22, Travel Time Pay for Employee with Alternative Worksites, p. 2 <www.dir.ca.gov/dlse/opinions/2003-04-22.pdf> [as of Feb. 19, 2014].)[12]  Again, while the DLSE opinion letter expressly addresses travel time compensation, not expenses (see *id.* at p. 4 ["Among the issues not addressed in this letter are those involving expense reimbursement for travel"]), it nonetheless provides useful guidance in understanding whether a commute deduction must always be based on actual travel between an employee's home and an assigned office.

We find that the trial court reasonably concluded that travel compensation cases are analogous, and therefore applicable, to the travel expense reimbursement issues raised in the present case.  Hence, its determination that Pacific Bell's commute deduction

---

[11]Plaintiffs do not appear to dispute that employees' travel expenses for a commute to and from their assigned workplace is normally not subject to mileage reimbursement.  (See *Sullivan*, *supra*, 2009 WL 3353300, at p. 7; cf. *Wilson v. Kiewit Pacific Co.* (N.D. Cal., Dec. 6, 2010, C 09-03630 SI) 2010 WL 5059522, at p. 7 [modifying class definition to include employees "who were not reimbursed for non-commute mileage expenses incurred in using personal vehicles to travel to off-site meetings or trainings"]; 26 CFR 1.262-1(b)(5) [under Internal Revenue regulation, the "taxpayer's costs of commuting to his place of business or employment are personal expenses and do not qualify as deductible expenses"].)

[12]The "DLSE's opinion letters, " ' "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." ' " (*Brinker*, *supra*, 53 Cal.4th at p. 1029, fn. 11; accord, *Morillion*, *supra*, 22 Cal.4th at p. 584 [finding "persuasive" an interpretation of labor law in a DLSE opinion letter].)

policy is not unlawful on its face, but instead requires an evaluation of the evidence through the lens of analogous law related to employee travel time and employer control did not rest on improper criteria or erroneous legal assumptions. (See *Brinker*, *supra*, 53 Cal.4th at p. 1022.)

### c. *Trial Court's Conclusion that Individual Questions Predominate*

Once the court concluded that Pacific Bell's commute deduction policy is not unlawful on its face, but instead depends on the question of employer control, it further found that, in order to prove their claims related to that policy, putative class members would have to produce evidence beyond the written policy itself to prove liability. (See *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1364.) The question then became whether resolution of issues related to Pacific Bell's allegedly unlawful application of this facially valid policy was amenable to class treatment.

Plaintiffs assert that common questions predominate because all sales executives were required to use their own cars to do their job and, therefore, they—like the employees in *Morillion*—were under their employer's control during their commutes, whether they drove to the office before heading into the field or not. Therefore, according to plaintiffs, all sales executives should have been reimbursed for their commute mileage expenses. However, even assuming—despite some evidence to the contrary—that a personal vehicle was required, the trial court reasonably concluded that that fact alone would not bring sales executives as a class within the ambit of *Morillion*, in which the employer required employees "to meet at the departure points at a certain time to ride its buses to work, and it prohibited them from using their own cars, subjecting them to verbal warnings and lost wages if they did so." (*Morillion*, *supra*, 22 Cal.4th at p. 587.) Rather, any determination of employer control would require an examination of all relevant evidence to assess the extent of Pacific Bell's control over sales executives' commutes. (See *Madera Police Officers Association v. City of Madera* (1984) 36 Cal.3d 403, 411 [level of employer's control over employee's activities is a fact-specific determination and courts "must examine employer's restrictions cumulatively to assess their overall effect" on employee's time].)

23

The anecdotal evidence related to the question of employer control included the following. First, the evidence was conflicting as to whether sales executives are required to use their own vehicles for their work, with plaintiffs submitting evidence indicating that carpooling only occasionally occurs and Pacific Bell submitting evidence showing that some sales executives carpool regularly. Second, regardless of any personal vehicle requirement, plaintiffs do not argue, and have offered no evidence showing, that Pacific Bell controls any other aspects of sales executives' commutes, such as when they start or end their day, the route they take to their office or their first sales stop, or the personal errands that can be made enroute. Since, unlike the farm workers in *Morillion*, Pacific Bell does not control "when, where, and how" sales executives have to travel to work (*Morillion*, *supra*, 22 Cal.4th at p. 586), the trial court reasonably concluded that any questions regarding employer control would necessarily involve the idiosyncratic circumstances and experiences of particular sales executives during their commutes.

In addition, as the trial court observed, the parties' evidence raises questions about what in fact constitutes each sales executive's commute. For example, both parties submitted evidence showing that there is a great deal of variation with respect to how often each sales executive goes into his or her assigned office before heading into the field. Some sales executives go to the office daily, while others do so weekly or less. For some sales executives, the frequency with which they go to their office also varies from week to week. Moreover, some sales executives have no permanent or personal assigned space at their home office, but instead work primarily out of their cars. Based on this evidence, the trial court found that liability could depend on various factors, including how often sales executives must go to their assigned offices for that round trip to constitute their normal commute, or, for sales executives who rarely go into the office, whether the office or the first stop is the normal commute. (Cf. *Sullivan*, *supra*, 2009 WL 3353300, at p. 5 [involving "commute" of temporary agency employees to and from job interviews in their own vehicles, presumably from their homes]; DLSE Opinion Letter No.2003.04.22, pp. 3-4 [DLSE does not normally consider employees not assigned to a

24

particular workplace "to be in the same category as workers who are, by the nature of their occupations, normally assigned to a specific work location . . . ."].)

Furthermore, as Pacific Bell notes, putative class members' interest in having the normal commute deduction based on the first place traveled versus their assigned home office would vary by putative class members, depending on which location is further from his or her home, resulting in an impermissible conflict within the class. (See *J.P. Morgan & Co., Inc. v. Superior Court* (2003) 113 Cal.App.4th 195, 215 [record only supported "conclusion that the trial court abused its discretion in disregarding the evidence of a conflict of interest among the proposed class members that goes to the very subject matter of the litigation"].)

In sum, the trial court reasonably concluded that the varying circumstances of employee commute patterns would give rise to numerous individualized legal and factual issues related to the extent of Pacific Bell's control over sales executives' commutes. (See *Arenas v. El Torito Restaurants, Inc.* (2010) 183 Cal.App.4th 723, 732 ["a class action will not be permitted if each member is required to 'litigate substantial and numerous factually unique questions' before a recovery may be allowed"].)[13] Accordingly, substantial evidence supports the court's finding that common questions do not predominate as to Pacific Bell's liability based on the commute deduction and that the elements necessary to establish liability are not "susceptible of common proof." (*Brinker*, *supra*, 53 Cal.4th at p. 1024; accord, *Wet Seal*, *supra*, 210 Cal.App.4th at pp. 1362–1363; compare *Bradley v. Networkers International, LLC* (2012) 211 Cal.App.4th 1129, 1147 [finding that, irrespective of merits of plaintiffs' claim, "[t]he critical fact is

---

[13]Contrary to plaintiffs' claim, the differences among putative class members' circumstances with respect to the commute deduction do not merely go to the question of damages. Rather, these differences would require individualized legal and factual analyses to resolve issues related to Pacific Bell's liability. (Compare *Jaimez*, *supra*, 181 Cal.App.4th at p. 1307 [where a common legal issue predominated, "[t]he fact that individualized proof of damages may ultimately be necessary" did not mean "that [plaintiff's] theory of recovery is not amenable to class treatment"].)

25

that the evidence likely to be relied upon by the parties would be largely uniform throughout the class"].)

## 2. *Mileage Expense Reimbursement*

Plaintiffs argue that common questions predominate as to whether Pacific Bell engages in practices that result in a systematic failure to reimburse sales executives for their mileage expenses.

In its order denying class certification, the trial court found, with respect to the indemnity class, that, with the exception of the commute deduction, "the evidence simply does not reveal practices that are systematic or consistent as between the three different geographic regions into which [Pacific Bell's] Door to Door operations in California for U-Verse products were organized or that are even consistent between the putative class members within a given region. While the evidence leaves little doubt that some [sales executives] were never fully compensated for their mileage expenses, it also shows that the reasons why this was so are quite different from one testifying [sales executive] to the next."

The court therefore concluded: "[F]indings regarding mileage reimbursement requests that were rejected, whether because they were submitted late, were supported by mileage logs based on odometer readings instead of MapQuest or Google Maps estimates, or for some other reason, and findings regarding mileage reimbursement requests that were modified, or not submitted at all, due to threat of audit, articulation of 'caps,' or lack of understanding of the submission process, whether because of inadequate training or some other reason, are all individualized in nature, and Plaintiffs' arguments that all of these individualized inquiries have a 'common thread' or reflect a 'common theme' misses the point. The anecdotal evidence presented by Plaintiffs does not support the theory that under-reimbursement and/or non-reimbursement was/were the rule rather than the exception. . . . Issues requiring separate adjudication clearly predominate."

According to plaintiffs, the trial court failed to understand that, although Pacific Bell has a written policy acknowledging employees' right to mileage reimbursement,

common questions nonetheless predominate because the evidence demonstrates that Pacific Bell's management engaged in a variety of practices that kept sales executives from being fully reimbursed for their mileage expenses.

*Wet Seal*, *supra*, 210 Cal.App.4th 1341, 1357, sheds some light on this question. In that case, the employer's written travel reimbursement policy stated that employees would be reimbursed for their expenses, but the plaintiffs' theory of liability was that, as a matter of practice, employees were not reimbursed for their mileage expenses. The trial court found that the plaintiffs' own evidence demonstrated that the employer's practices varied, with some putative class members stating they had been reimbursed for mileage, while others stated they had not. (*Id.* at p. 1358.) "Ultimately, the court concluded that proving liability based on the alleged 'hit or miss' reimbursement policy would require individualized inquiries to address numerous issues . . . ." (*Ibid.*)

Similarly, in *Brinker*, *supra*, 53 Cal.4th 1004, 1052, "the trial court was presented with anecdotal evidence of a handful of individual instances in which employees worked off the clock, with or without knowledge or awareness by [the employer's] supervisors. On a record such as this, where no substantial evidence points to a uniform, companywide policy, proof of off-the-clock liability would have had to continue in an employee-by-employee fashion, demonstrating who worked off the clock, how long they worked, and whether [the employer] knew or should have known of their work."

Likewise, in the present case, Pacific Bell had a formal policy that required reimbursement for all mileage expenses other than the commute deduction. As the trial court concluded, the anecdotal evidence submitted shows a great variety of practices on the part of both individual sales executives and supervisors with respect to mileage reimbursement. This included some sales executives who reported that they were told to use their odometer to track mileage, while others said they were instructed to use an Internet mapping program. Evidence was submitted showing that some sales executives did not believe they received adequate training on how to submit mileage reimbursement requests, but evidence was also submitted showing that ongoing training was provided, as well as reminders to turn in reimbursement requests.

27

Plaintiffs also submitted evidence showing that a Bay Area manager filed a report showing that almost one-third of the sales executives she supervised (24 out of 75) had not requested mileage reimbursement for a particular month, and indicated that those who did not submit mileage information claimed it on their taxes, rather than submitting reimbursement requests. This evidence does not, however, demonstrate a systematic, company-wide policy or practice on the part of Pacific Bell to keep sales executives from being fully reimbursed for their mileage expenses. Nor does it indicate why these 24 employees failed to seek reimbursement. Just a few of the many possible reasons could include, in addition to any improper action or inaction on the part of particular supervisors, sales executives carpooling, working at mobility stores, or not incurring reimbursable mileage due to a short commute (see pt. II., *ante*, for a discussion of the commute deduction). Indeed, most of the sales executives who submitted declarations in the trial court stated that they were reimbursed for their mileage expenses every time they submitted a reimbursement request, but also stated that they were under-reimbursed for various reasons.[14]

---

[14]Two of the sales executives who claimed that they did not request reimbursement because the mileage reimbursement process was not adequately communicated to them were the plaintiffs in this case, Kelvin Session and Emanuel Lopez, and evidence of their experiences further reflects the variety of individualized issues that exist regarding sales executives' mileage expense reimbursement. For example, Session testified that, during his seven months as a sales executive, he did not submit any mileage reimbursement requests due to a lack of training, and finally decided to take an income tax deduction instead. Evidence submitted by plaintiffs and Pacific Bell shows that Session received training on how to submit a mileage reimbursement request both during his initial orientation and during a subsequent training session that he attended, regarding the latter of which he stated he could not hear the presenter.

Lopez worked as a sales executive for about 16 months, but submitted mileage reimbursement requests for only the last four months of his employment. He testified that he could not understand how to use the Excel spreadsheet, which is utilized to prepare the mileage log. Evidence submitted by Pacific Bell shows that, during his employment, Lopez received repeated instructions on how to submit a mileage report. In addition, when he told his supervisor that he did not understand how to prepare his mileage log or submit his mileage expense request, she met with him at least twice to train him on the process and sent him sample mileage reimbursement forms. When

In *Wet Seal*, *supra*, 210 Cal.App.4th 1341, 1366, we similarly rejected the plaintiffs' contention that sales records establishing that employees purchased the company's merchandise during the relevant class period could provide a common method of class-wide proof that salespeople were required to buy Wet Seal clothing. As we stated, the plaintiffs failed "to explain how evidence of employee purchases establishes Wet Seal's liability. Evidence that putative class members purchased Wet Seal merchandise is not evidence that they were forced to purchase that merchandise." (*Ibid.*) Here too, given the varied evidence submitted by both parties, evidence that some sales executives did not request mileage reimbursement is not evidence that they were all similarly discouraged or prevented from requesting such reimbursement.

Although Pacific Bell's policy was to reimburse sales executives for all miles driven, other than their normal commute, plaintiffs did submit evidence showing that, in San Diego, one or more supervisors gave sales executives a "Mileage Voucher Help Sheet," which expressly limited reimbursement to $500 or, later, to $300. Whether this document was distributed widely within San Diego is not clear from the evidence. Plaintiffs offered additional anecdotal evidence of other sales executives whose managers told them not to request reimbursement of more than $500 or they would be seen as a

_____

Lopez continued to have difficulty completing the Excel spreadsheet used for mileage logs, his supervisor spoke to his girlfriend so that she could assist him to complete the mileage log.

Other sales executives who submitted declarations stating that they were not adequately trained on mileage reimbursement, and therefore were not reimbursed, included Randy Fitzhugh, whose supervisor claimed to have provided such training at Fitzhugh's orientation, but noted that he told Fitzhugh he likely would not be eligible for mileage reimbursement since his commute was further than his sales area. Courtney Davis submitted a mileage reimbursement request after her first month of employment, attended a group training session on mileage reimbursement, missed parts of weekly meetings due to childcare issues, and submitted requests for reimbursement at the end of her employment with Pacific Bell as part of a "mini-grievance," at which time she received payment. Plaintiffs also note that putative class member Melvin Steele did not receive a reimbursement check for his final month in Pacific Bell's employment until after he filed a declaration in this case. The record shows, however, that Steele received reimbursement for his mileage expenses 27 times prior to that last month of employment.

29

liability or might be audited. Again, this anecdotal evidence does not demonstrate a systematic policy or practice throughout Pacific Bell to limit mileage reimbursement for sales executives to a certain amount.

*Wet Seal*, *supra*, 210 Cal.App.4th 1341, is relevant to the question of whether this evidence shows that common questions predominate. In *Wet Seal*, we explained that evidence of emails from the employer's district director stating that employees were required to wear the company's attire did not undermine the trial court's conclusion that there was no class-wide method of proving that the employer unlawfully required employees to wear company clothing since plaintiffs did "not identify any evidence in this record establishing that [the district director] was in a position to establish company-wide policy for Wet Seal. They also ignore unequivocal evidence that the e-mails were not widely disseminated in terms of time or place. Indeed, to the extent that these e-mails can be construed as evidence that some Wet Seal employees were coerced to purchase Wet Seal merchandise, they support the trial court's conclusion that assessing liability will require an individualized inquiry." (*Id*. at pp. 1365–1366.) These same principles are applicable to plaintiffs' claims in this case that the mileage cap described in the Mileage Voucher Help Sheet provides additional evidence of Pacific Bell's systematic policy or practice of failing to reimburse sales executives for their mileage expenses. This evidence, however, shows only that one or more supervisors in San Diego instructed some sales executives to limit their reimbursement claims to $500 or $300. This does not provide evidence of a uniform company-wide policy or systematic practice of limiting sales executives' mileage reimbursement. (See *ibid*.)

Plaintiffs now argue that this evidence of a limit on the amount of reimbursement permitted supports certification of a Southern California subclass of sales executives whose monthly mileage reimbursement was capped at either $500 or $300, and that the trial court abused its discretion by failing to certify such a subclass. Plaintiffs, however, never properly raised this issue in the trial court. In their motion for class certification and in related documents filed in the trial court, plaintiffs used evidence of the mileage cap on reimbursement contained in the Mileage Voucher Help Sheet as support for their

claim of a common thread of practices that caused the entire class of sales executives to be unreimbursed or under-reimbursed. At the class certification hearing, plaintiffs' counsel for the first time acknowledged that liability for this limitation on reimbursement would potentially apply only to a San Diego or Southern California subclass.[15] Plaintiffs, however, never in fact formally requested certification of such a subclass in the trial court, and the evidence on this issue is sparse and not dispositive one way or the other.[16] Because plaintiff's request to add a Southern California subclass was not fairly presented in the trial court, we will not address this issue for the first time on appeal.

In support of their claim that Pacific Bell used a variety of policies and practices to deny sales executives the mileage reimbursement to which they were entitled, plaintiffs rely on *Stuart v. RadioShack Corp.* (N.D.Cal. Feb. 5, 2009, No. C-07-4499 EMC) 2009 WL 281941 (*Stuart I*), in which the plaintiffs challenged RadioShack's written policy of denying mileage reimbursement to employees for the incidental business use of their cars

---

[15]At the hearing, while discussing the mileage cap issue, plaintiffs' counsel initially stated, "So that's a common illegal practice that they engaged in that's in the record that led to under-reimbursement. So I don't see how we can't get certification when you have a written policy that's illegal and was in effect throughout a significant component of the class. [¶] Yes, we didn't show that it was in effect in Northern California, but so what. It doesn't matter. We don't have to show identicality. Right? We need to show common questions." The court then asked, in light of the limited geographic area in which the mileage cap was allegedly present, "Don't I have to develop subclasses on that?" Counsel responded, "I think you would for that particular point. But I think if you look at the whole series of practices in conjunction and in totality, you see a common theme that the employer had various management practices in place that would cause either failure to report or under-reporting of mileage." Later, when the court observed that the Mileage Voucher Help Sheet was not "a class-wide interface," counsel stated, "It was used in San Diego, Your Honor. That's a significant subclass."

[16]We do observe that, if there was an explicit limit of $500 or $300 on monthly mileage expense reimbursement for sales executives in the Southern California area, those facts would suggest a uniform policy that might be applicable to all members of a putative San Diego or Southern California class. (See, e.g., *Jaimez*, *supra*, 181 Cal.App.4th at p. 1300 [where plaintiff's theory of recovery involved uniform policies applicable to all putative class members, class certification was appropriate regardless of effects of those policies on individual class members].) That question, however, is not before us.

to transfer items between stores (the inter-company store transfer or "ICST" policy). (*Id*. at pp. 5, 14.) Even though this policy was changed during the class period, the plaintiffs presented evidence that RadioShack failed to publicize this change to employees, which led to a continued lack of reimbursement. (*Id*. at p. 6.) The district court found that the claimed lack of reimbursement was a common issue that provided a class-wide method of proving liability. In explaining its decision to certify a class, the court stated: "[T]he fact that managers may have had some discretion to determine what ICSTs were incidental and which were not (and thus reimbursable) does not change the fact that the central issue in this case is whether there was a failure to reimburse, which would constitute a violation of the California Labor Code. That is, the issue is not *why* employees were not reimbursed but *whether* they were. That legal issue—the legality of failing to reimburse employees for ICSTs—predominates this case. Determining who in fact was reimbursed and who was not will be a straightforward factual question that informs the remedy, and will likely be resolved by documents. Those determinations will not predominate this case." (*Id*. at p. 15; see also *Wet Seal*, *supra*, 210 Cal.App.4th at pp. 1366–1367.)

According to plaintiffs, *Stuart I* is directly on point here in that Pacific Bell's written policy of mileage reimbursement is not the policy it actually applied to its sales executives. We disagree. Even after the policy change in *Stuart I*, the evidence showed that RadioShack's failure to publicize that change resulted in the same defacto company-wide policy of non-reimbursement for ICSTs that had previously existed under the written policy. (*Stuart I*, *supra*, 2009 WL 281941 at p. 6.) Thus, the court concluded that evidence of variations in application of that policy did not defeat the motion for class certification since any individual inquiries as to whether a class member was denied reimbursement under the ICST policy was a damages question that did not predominate over the common core question of liability. (*Id*. at p. 15.) The common question of *whether* employees were reimbursed predominated throughout the class period. (*Ibid*.)

In this case, conversely, Pacific Bell's policy was to reimburse sales executives for their mileage, and the trial court reasonably found that this evidence simply does not show a systematic class-wide failure to reimburse. Rather, as the trial court stated, it

32

showed that some sales executives were not fully reimbursed for various possible reasons, and that such under-reimbursement or non-reimbursement was the exception, not the rule. Therefore, to prove liability, the predominant question would not be *whether* sales executives were fully reimbursed, but *why* those who were not fully reimbursed were not. Accordingly, individualized liability determinations would be necessary. (See *Stuart I*, *supra*, 2009 WL 281941, at p. 15; see also *Wet Seal*, *supra*, 210 Cal.App.4th at pp. 1366–1367 [in distinguishing *Stuart I*, we explained that, "in order for evidence of sales records to provide a common method of proving liability [for forcing sales staff to buy Wet Seal merchandise], those records would have to demonstrate why the purchases were made"].)

Plaintiffs nevertheless argue that common questions regarding liability exist here because "[a] heightened standard exists against those employers who fail to indemnify their employees under . . . Section 2802, despite having had knowledge that those employees were incurring reimbursable expenses." Plaintiffs cite a subsequent opinion in the *Stuart* case, in which the district court stated: "Once an employer knows or has reason to know that the employee has incurred an expense, then it has the duty to exercise due diligence and take any and all reasonable steps to ensure that the employee is reimbursed for the expense." (*Stuart II*, *supra*, 641 F.Supp.2d at p. 905; cf. *Brinker*, *supra*, 53 Cal.4th at p. 1034.)

This due diligence requirement does not assist plaintiffs, however. The fact that some sales executives were either under-reimbursed or not reimbursed at all does not automatically show a lack of due diligence on Pacific Bell's part. (Cf., e.g., *Brinker*, *supra*, 53 Cal.4th at p. 1034 ["an employer must relieve the employee of all duty for the designated [meal break] period, but need not ensure that the employee does not work"].) As already discussed, the evidence here shows that, for those sales executives who did not regularly submit mileage reports or who did not receive full reimbursement, individual factual questions predominate as to why they did not. Hence, as the trial court found, plaintiffs have not shown that common factual questions predominate regarding whether Pacific Bell exercised due diligence in reimbursing sales executives. (Cf. *id*. at

p. 1052 [where no substantial evidence pointed to "a uniform, companywide policy," proof of employer's alleged unlawful policy "would have had to continue in an employee-by-employee fashion," to demonstrate, inter alia, whether employer "knew or should have known of their work"].)

Substantial evidence supports the trial court's finding that individual questions predominate as to Pacific Bell's liability for the alleged failure to fully reimburse sales executives for mileage expenses. (See *Brinker*, *supra*, 53 Cal.4th at pp. 1022, 1052; see also *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1367 [parties' declarations had reinforced trial court's "conclusion that plaintiffs' theory of liability was not susceptible to common class-wide proof but rather 'would require individualized inquiries into a myriad of circumstances depending on the particular directions of individual store managers and supervisors at numerous stores in widely varying locations and over the course of many years' "].)[17]

In conclusion, the court did not abuse its discretion when it refused to certify an indemnity class based on Pacific Bell's commute deduction policy and its alleged systematic practice of failing to fully reimburse sales executives for their mileage expenses. (See *Brinker*, *supra*, 53 Cal.4th at p. 1022.)

### III. *The Mobility Store Subclass*

Plaintiffs contend the trial court abused its discretion when it denied their request to certify a subclass of approximately 200 sales executives who temporarily worked at mobility stores sometime between November 2008 and March 2009, and who were

---

[17]Plaintiffs express concern that the trial court's refusal to certify an indemnity class, despite its acknowledgement that some sales executives "were never fully compensated for their mileage expenses," is in conflict with section 2802, subdivision (a), which requires that an employer indemnify an employee "for all necessary expenditures . . . ." That plaintiffs' claims are not amenable to class treatment does not mean that plaintiffs or any other sales executives are precluded from pursuing individual claims against Pacific Bell for failure to fully reimburse them for their mileage expenses. (See, e.g., *Wet Seal*, *supra*, 210 Cal.App.4th at p. 1365.)

allegedly misclassified as exempt from California labor laws covering overtime pay, meal periods, and rest breaks.[18]

## A. *Factual Background*

### *Plaintiffs' Evidence*

Plaintiffs submitted evidence, including the declarations of plaintiff Lopez and other putative class members, showing that some sales executives were assigned to work at mobility stores between late 2008 and the spring of 2009. These sales executives stated that they were pressured to work more than eight-hour days and forty-hour weeks at the mobility stores. They were also told that they were not entitled to rest breaks or meal breaks or to overtime compensation because they were managers and therefore were exempt employees. They could only take breaks when the store was not busy.

### *Pacific Bell's Evidence*

Pacific Bell submitted evidence, including declarations and deposition excerpts, showing that sales executives were placed at mobility stores for different reasons, and that their duties and the length of time they worked in the stores varied based on their geographic market.

For example, in Northern California, sales executives "were placed in the stores to avoid making as many residential sales while there was an installation backlog." Sales executives in Los Angeles and San Diego were asked to work at the mobility stores, primarily during the holidays, to train store employees on U–verse, to increase sales for that product. Their "primary job responsibility was to coach and train Mobility employees regarding U-verse sales, since the Sales Executives were subject matter experts on U–verse." In addition, some sales executives worked at a mobility store for two weeks or less while others did so for up to three months.

---

[18]Plaintiffs do not dispute that these sales executives "were covered by the outside sales exemption while spending their day in the field," but claim that Pacific Bell improperly continued to classify them as exempt during the period they worked at mobility stores.

Pacific Bell also submitted evidence showing that, in 2008, sales executives were given the option of working full time or part time at the mobility stores. Those who chose to work part time might work for three or four hours at a store before going into the field to perform outside sales. Others worked at the stores only on the weekends. Those who worked full time were expected to work eight-hour days, five days a week. They were provided a one-hour lunch break and "had the flexibility to take rest breaks." In 2009, from January to early March, sales executives in Northern California who worked at mobility stores did so full time. Sales executives in Los Angeles and San Diego apparently did not work at mobility stores in 2009.

Compensation for sales executives who worked at mobility stores in 2008 was comprised of their base salary plus commissions based on store sales. Some sales executives made more in commission than in base salary while working at the stores. In 2009, compensation for sales executives who worked at mobility stores changed in that they were guaranteed their target commission, which was more than their base salary.

## B. *Legal Analysis*

Plaintiffs make only a cursory argument with respect to the mobility store subclass. They assert that common questions predominate as to whether Pacific Bell violated the California Labor Code by continuing to classify all sales executives who temporarily worked at the mobility stores as exempt and by requiring them to work in excess of eight hours a day and 40 hours in a week (§ 510, subd. (a)), as well as by failing to provide them with meal periods and rest breaks (§§ 226.7, 512).

In denying class certification of a mobility store subclass, the trial court observed that plaintiffs had failed to address the possible "continuing applicability of the outside sales exemption to those [sales executives] who apparently split their time between the Mobility Store to which they were assigned and their regular outside sales work, as well as the potential applicability of the commission sales exemption and/or the administrative exemption." The court found this failure "telling," and concluded that the record supported Pacific Bell's position that "neither the improper classification issue nor the

36

issues that flow therefrom regarding overtime pay, meal breaks and rest breaks are amenable to treatment on a class-wide basis."

"Section 1173 grants the [Industrial Welfare Commission (IWC)] a broad mandate to regulate the working conditions of employees in California, including the setting of standards for minimum wages and maximum hours. [Citation.] To that end, the IWC has promulgated 17 different wage orders that apply to distinct groups of employees. (Cal. Code Regs., tit. 8, §§ 11010–11170.)" (*Combs v. Skyriver Communications, Inc.* (2008) 159 Cal.App.4th 1242, 1253.)[19] These orders describe, inter alia, the criteria for finding employees exempt from some of the standards. (See, e.g., Cal. Code Regs., tit. 8, § 11040, subds. (1)(C) & (2)(M) [outside sales exemption (IWC Order No. 4-2001 (2)(M))]; Cal. Code Regs., tit. 8, § 11040, subd. (3)(D) [commission sales exemption (IWC Order No. 4-2001(3)(D))]; Cal. Code Regs., tit. 8, § 11040, subd. (1)(A)(2) [administrative exemption (IWC Order No. 4-2001(1)(A)(2))].)

In their briefing on appeal, as in the trial court, plaintiffs did not address the evidence regarding the potential applicability of these exemptions to putative class members, such as evidence that some sales executives continued to spend the majority of their time making outside sales while working part-time at a mobility store. Those sales executives would remain covered by the outside sales exemption. (See Cal. Code Regs., tit. 8, § 11040, subds. (1)(C) & (2)(M) [outside sales exemption applies to an employee who "customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products"].) Similarly, the evidence shows that the formulas by which sales executives earned commission varied based on whether they worked at mobility stores in 2008 or 2009, and that some sales executives may have earned more than half their compensation from commissions, in which case the commission sales exemption would apply. (See Cal. Code Regs., tit. 8, § 11040, subd. (3)(D) [commission sales exemption

---

[19]The IWC's wage orders can be found at the website of California's Department of Industrial Relations, http://www.dir.ca.gov/iwc/wageorderindustries.htm.

applies to employees who earn more than one and one-half times minimum wage and are paid more than half of their compensation in form of commissions].)

Finally, the evidence shows that sales executives in Los Angeles and San Diego were brought into the mobility stores to train and coach the mobility store sales staff regarding U-verse. Those employees could have been subject to the administrative exemption. (See Cal. Code Regs., tit. 8, § 11040, subd. (1)(A)(2)(a)(I), (b), & (d) [administrative exemption applies to any employee, inter alia (1) whose duties primarily involve "[t]he performance of office or non-manual work directly related to management policies or general business operations of his/her employer or his employer's customers"; (2) "[w]ho customarily and regularly exercises discretion and independent judgment"; and (3) "[w]ho performs under only general supervision work along specialized or technical lines requiring special training, experience, or knowledge"].) The trial court reasonably concluded that evaluation of the applicability of the administrative exemption to sales executives who worked temporarily at mobility stores to train and coach workers "would require individualized inquiries to determine whether its elements were satisfied." (*Soderstedt v. CBIZ Southern California, LLC* (2011) 197 Cal.App.4th 133, 148 [where evidence showed that employees regularly exercised varying levels of discretion and independent judgment and had varying levels of supervision, depending on a number of factors, substantial evidence supported trial court's finding that common questions did not predominate].)

Plaintiffs provide no substantive argument to refute the potential applicability of these exemptions to many of the sales executives who worked at mobility stores, other than to state that the outside sales exemption no longer applied to these sales executives and that the administrative exemption did not apply because there was no showing that the training sales executives performed "involved any degree of discretion or independent judgment." These summary assertions are not persuasive in demonstrating that plaintiffs' claims are amenable to class treatment. Substantial evidence supports the trial court's finding that individual questions predominate as to Pacific Bell's liability for misclassifying as exempt those sales executives who temporarily worked at mobility

38

stores.  (See *Brinker*, *supra*, 53 Cal.4th at pp. 1022, 1052; see also *Dunbar v. Albertson's, Inc.* (2006) 141 Cal.App.4th 1422, 1431 [in light of "significant variation in [employees'] work from store to store and week to week," trial court had concluded that "very particularized individual liability determinations would be necessary"]; accord, *Mora v. Big Lots Stores, Inc.* (2011) 194 Cal.App.4th 496, 507; cf. *Marlo v. United Parcel Service, Inc.* (9th Cir. 2011) 639 F.3d 942, 948 ["the existence of a policy classifying [employees] as exempt from overtime-pay requirements does not necessarily establish that [they] were misclassified, because the policy may have accurately classified some employees and misclassified others"].)

Plaintiffs add that, even were sales executives in mobility stores exempt pursuant to the commission sales exemption, they were still entitled to meal periods and rest breaks, which they did not receive.  But the evidence does not support their claim that Pacific Bell had a uniform policy or systematic practice of denying sales executives working temporarily in mobility stores meal periods and rest breaks.  Rather, as the trial court found, individual factual questions would need to be resolved to determine which sales executives were not otherwise exempt from meal and rest break requirements and, of those, which were denied such breaks.  Substantial evidence supports the trial court's finding that individual questions predominate on this point too.  (See *Brinker*, *supra*, 53 Cal.4th at pp. 1022, 1052; see also *Arenas v. El Torito Restaurants, Inc. supra*, 183 Cal.App.4th at p. 732 [" '[I]f a class action "will splinter into individual trials," common questions do not predominate and litigation of the action in the class format is inappropriate.  [Citation.]' "]; accord, *Mora v. Big Lots Stores, Inc.*, *supra*, 194 Cal.App.4th at p. 507.)

The trial court did not abuse its discretion in refusing to certify a mobility store subclass.  (See *Brinker*, *supra*, 53 Cal.4th at p. 1022.)

### *DISPOSITION*

The order denying class certification is affirmed.  Costs on appeal are awarded to defendant Pacific Bell.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Siggins, J.*

*Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.